## AFFIDAVIT OF SARAH DE LAIR IN SUPPORT OF APPLICATION FOR A CRIMINAL COMPLAINT

I, Sarah De Lair, being duly sworn, depose and state the following:

1. I am a Special Agent with the Federal Bureau of Investigation and have been have been so employed since January 2004. I am currently assigned to the Lakeville, Massachusetts Resident Agency within the Boston Division, where my primary duties include the investigation of financial crimes and public corruption matters. I have attended training concerning the public integrity laws and corruption of public officials. I am a law enforcement officer of the United States within the meaning of Section 2510 (7) of Title 18, United States Code, in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint affidavit and does not set forth all of my knowledge about this matter.

2. I submit this Affidavit in support of an application for a criminal complaint charging Genoveva ANDRADE ("ANDRADE") with: (1) Count One – Extortion Conspiracy, in violation of 18 U.S.C. § 1951; (2) Count Two – Extortion, in violation of 18 U.S.C. §§ 1951 and 2; (3) Count Three – Theft and Bribery, in violation of 18 U.S.C. § 666(a)(2); and (4) Count Four – False Statements, in violation of 18 U.S.C. § 1001(a)(2).

### Relevant Parties

3. ANDRADE was the Chief of Staff to Fall River Mayor Jasiel F. Correia, II ("Correia")[1] from November 2017 through December 2018. Prior to that, she was his campaign

---

[1] In connection with his role in the offenses described herein Correia will be separately charged in a September 5, 2019 First Superseding Indictment with five counts of Extortion

manager. In January 2019, ANDRADE stepped down to run CORREIA's March 2019 recall campaign.

4. "MJ Vendor #4" and "MJ Vendor #5" were the owners of marijuana companies that did business in and affecting interstate commerce, and that were seeking to operate in Fall River.

5. "Middleman #2" was the owner of several commercial and residential real estate properties in Fall River, and a friend of CORREIA. Middleman #2 did not hold any official position in Fall River government.

General Allegations

6. At all times relevant to this Criminal Complaint, the City of Fall River, Massachusetts ("Fall River") was a local government that received approximately $5.9 million in federal assistance from the U.S. Department of Housing and Urban Development in the one-year period between July 1, 2017 and June 30, 2018, and approximately $4.2 million in the one-year period between July 1, 2018 and June 30, 2019.

7. According to Chapter C, Section 3.2 of Fall River's charter, the executive powers of the city were vested solely in the mayor, who exercised general supervision and direction over all city agencies, and was responsible for the administration of all city activities and functions.

8. Medical marijuana was legalized in Massachusetts in 2012; recreational marijuana was legalized in December 2016. Under Massachusetts law, the process for obtaining a license to operate a marijuana business (whether medical or recreational) required a letter of non-opposition from the head of the municipality or local government where the applicant sought to operate the

---

Conspiracy, in violation of 18 U.S.C. § 1951, five counts of Extortion, in violation of 18 U.S.C. §§ 1951 and 2, and one count of Bribery, in violation of 18 U.S.C. § 666(a)(1)(B).

marijuana business. The non-opposition letter typically stated that head of the local government had verified with the appropriate local officials that the proposed marijuana facility was located in a permissible zoning district that allowed such use.

9. Because non-opposition letters were essential to marijuana vendors, the competition for them amongst applicants seeking to operate marijuana businesses was substantial.

10. In addition to a non-opposition letter, applicants seeking a license to operate a marijuana business were also required to enter into a host community agreement with the local government in which they sought to operate. A host community agreement is an agreement between a marijuana company and the local government that typically provides that the marijuana company will give up to three percent of its gross sales and between $25,000 and $50,000 annually based on the size of the marijuana facility to the local government in order to do business there. In Fall River, once an applicant had a non-opposition letter, the host community agreement was typically a formality.

11. As mayor, Correia was solely responsible for approving all non-opposition letters in Fall River. Without a non-opposition letter from the mayor, an application to operate a marijuana dispensary in Fall River would not be approved in Massachusetts.

Counts One and Two: Extortion Conspiracy and Extortion, 18 U.S.C. §§ 1951 and 2

12. The object and purpose of the conspiracy was for ANDRADE and Correia to extort $150,000 from MJ Vendor #4 in exchange for a non-opposition letter from Correia.

Manner and Means

13. Among the manner and means by which ANDRADE and Correia carried out the conspiracy were:

    a. Offering MJ Vendor #4 a non-opposition letter in exchange for $250,000, but later negotiating the bribe down to $150,000;

    b. Falsely claiming – in order to induce the bribe – that Correia was going to approve only five or six marijuana dispensaries in Fall River;

    c. Agreeing to accept the bribe in two installments - $75,000 cash up front and the remainder after MJ Vendor #4 received his provisional marijuana license from the state; and

    d. Issuing MJ Vendor #4 a non-opposition letter.

Acts in Furtherance of the Conspiracy

14.    ANDRADE and Correia committed the following acts, among others, in furtherance of the conspiracy:

    a. In approximately June 2018, at a meeting with ANDRADE and MJ Vendor #4 in City Hall, Correia said that no more non-opposition letters would issue.

    b. Several days later, Correia and ANDRADE showed up unannounced at MJ Vendor #4's business in Fall River. When told MJ Vendor #4 was not there, Correia and ANDRADE agreed to return later that day.

    c. Later that day, when Correia and ANDRADE returned to the store, they went to an upstairs office with MJ Vendor #4. There, Correia told MJ Vendor #4 that he would give him a non-opposition letter in return for $250,000.

    d. MJ Vendor #4 reacted to Correia's demand for $250,000 with visible nervousness, which ANDRADE observed, and asked if she could use the restroom. MJ Vendor #4 escorted ANDRADE to the restroom, and returned to the office.

    e. Upon returning, MJ Vendor #4 asked Correia why the number (referring to the $250,000) was so high. Correia said it was for his legal fees. CORREIA also said that this would be the sixth and final non-opposition letter issued in Fall River.

    f. Correia and MJ Vendor #4 agreed on a $125,000 bribe (later modified to $150,000).

    g. As they walked out, ANDRADE asked MJ Vendor #4 if everything was alright. MJ Vendor #4 said yes. Then, ANDRADE said to MJ Vendor #4, "you're family now."

    h. At a subsequent meeting with MJ Vendor #4 and ANDRADE, Correia said he would reduce the legitimate payment MJ Vendor #4 had to make under the host community agreement if MJ Vendor #4 gave Correia an additional $25,000.

    i. MJ Vendor #4 agreed to the additional $25,000 bribe, bringing the total amount to $150,000. MJ Vendor #4 also agreed he would pay $75,000 cash up front for the letter, followed by another $75,000 after he received his provisional marijuana license from Massachusetts.

    j. Several days later, on or about July 5, 2018, Correia came to MJ Vendor #4's business in his official vehicle and instructed MJ Vendor #4 to get inside. Once inside, MJ Vendor #4 gave Correia $75,000 in cash in a contractor's clipboard. In return, Correia handed MJ Vendor #4 a non-opposition letter.

Count Three: Theft and Bribery, 18 U.S.C. § 666(a)(2)

15. In or before November 2017, when she was hired as chief of staff, ANDRADE and Correia agreed that, in return for her getting and keeping the job, she would kick back half of her salary to Correia. In addition, ANDRADE and Correia agreed that ANDRADE would kick back almost all of a bogus $10,000 "snow stipend" that Correia intended to give her.

16. On or about November 27, 2017, Correia appointed ANDRADE chief of staff at a salary of approximately $78,780 per year. The term of the agreement was from November 27, 2017 through December 31, 2018. As part of a M.G.L. c. 268A, §23(b)(3) conflict of interest disclosure, ANDRADE stated that, "I have taken an oath to perform to the best of my abilities with integrity and honesty." ANDRADE has also received ethics training.

17. On or about December 14, 2017, Correia personally approved a $10,000 "snow stipend" to ANDRADE, to be paid in two $5,000 installments, one in December 2017, and a second in January 2018.

18. ANDRADE received her first paycheck from Fall River for $2,046 on or about December 11, 2017. Days later, ANDRADE gave Correia $1,200.

19. ANDRADE received approximately $5,354 from Fall River on or about December 22, 2017, which included the first installment of the "snow stipend." Days later, ANDRADE gave Correia $4,300.

20. This pattern, in which ANDRADE promptly gave Correia approximately half of her paychecks (and almost all of the "snow stipend"), continued for at least eight months, until at least in or about July 2018.

21. In total, between December 2017 and July 2018, including salary and the "snow stipend," ANDRADE gave approximately $22,800 dollars to Correia.[2]

22. On or about March 29, 2018, CORREIA paid $10,000 for his current girlfriend's 2015 Mercedes G550. The final sales price of the vehicle was approximately $83,000.

23. On or about August 1, 2018, ANDRADE had lunch with MJ Vendor #5 to follow-up on MJ Vendor #5's concern that Correia had issued a non-opposition letter to MJ Vendor #4, whose business was located close to MJ Vendor #5's.

24. At this lunch, MJ Vendor #5 told ANDRADE that Correia was blaming her for the issuance of the non-opposition letter to MJ Vendor #4. ANDRADE replied, in sum and substance, "that's bul****t, there are lots of sleazy things the mayor has going on."

25. ANDRADE continued, in sum and substance, "you want to hear something even more f***ed up … I have to give [Correia] half of my salary." When asked why she would do that, ANDRADE replied that that was the deal she had to make to get (and keep) her job.

26. Separate and apart from the above lunch with MJ Vendor #5, on several occasions, ANDRADE has told Middleman #2 that the agreement she made in order to get (and keep) her job required her to give half of her salary to Correia. ANDRADE has also told Middleman #2 that Correia has a safe with "hundreds of thousands" of dollars that he has received from bribes.

---

[2] As noted above, in or about July 2018, ANDRADE conspired with Correia to extort approximately $150,000 from MJ Vendor #4.

Count Four:  False Statements, 18 U.S.C. § 1001(a)

27. On December 10, 2018, ANDRADE was interviewed at the United States Attorney's Office in Boston, Massachusetts in the presence of several federal law enforcement agents and accompanied by her attorney.

28. While the entire tenor of ANDRADE's interview was false and misleading, ANDRADE willfully and knowingly made the following materially false, fictitious, and fraudulent statements and representations:

   a. ANDRADE stated that the only time she got involved in a marijuana dispensary issue as Chief of Staff was when a group of marijuana investors that included former Fall River Mayor Flanagan wanted to meet with Correia when, in fact, as ANDRADE then and there knew, she was involved in the extortion of MJ Vendor #4;

   b. ANDRADE stated, "I, swear to you, no, [Correia] would not give a letter of non-opposition to an individual/group involved in the marijuana dispensary for money," when, in fact, as ANDRADE then and there knew, she and Correia had extorted MJ Vendor #4 for $150,000, and Correia had a safe full of bribe money; and

   c. ANDRADE stated that she had loaned Correia approximately $10,000 money, when, in fact, as ANDRADE then and there knew, the $22,800 she gave Correia was not a loan, but rather a result of an illegal bribe.

29.  Based on the foregoing, I have probable cause to believe that:

   a. Count One:  Between in or about June 2018 and July 2018, in the District of Massachusetts and elsewhere, ANDRADE and others, known and unknown to the United States, did conspire to knowingly obstruct, delay, and affect, and attempt to obstruct delay, and affect, in any way and degree, commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is ANDRADE and others conspired to obtained property not due to them or the offices they held, from MJ Vendor #4, with MJ Vendor #4's consent, under color of official right, in violation of 18 U.S.C. § 1951;

   b. Count Two:  Between in or about June 2018 and July 2018, in the District of Massachusetts and elsewhere, ANDRADE did knowingly obstruct, delay, and affect, and attempt to obstruct delay, and affect, in any way and degree, commerce and the movement of articles and commodities in commerce, by extortion, as those terms are defined in Title 18, United States Code, Section 1951; that is ANDRADE,

7

in concert with Correia, obtained property not due to Correia or his office, from MJ Vendor #4, with MJ Vendor #4's consent, under color of official right, in violation of 18 U.S.C. §§ 1951 and 2;

c. Count Three: Between in or about at least November 2017 and July 2018, in the District of Massachusetts, ANDRADE did corruptly give, offer, and agree to give anything of value to any person, that is, at least $22,800 to Correia, with intent to influence or reward an agent of a local government, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more, in violation of 18 U.S.C. § 666(a)(2); and

d. Count Four: On or about December 10, 2018, in the District of Massachusetts, ANDRADE, in any matter within the jurisdiction of the executive branch of the Government of the United States, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, in violation of 18 U.S.C. § 1001(a)(2).

SARAH DE LAIR,
Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 5th day of September 2019.

HON. DONALD L. CABELL
United States Magistrate Judge