```
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                                  )
UNITED STATES OF AMERICA,         )
                                  )         Criminal Action
          Plaintiff,              )         No. 18-10364-DPW
                                  )
v.                                )
                                  )
JASIEL F. CORREIA, II,            )
GENOVEVA ANDRADE,                 )
                                  )
          Defendants.             )
                                  )


           BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
                UNITED STATES DISTRICT JUDGE


                       MOTION HEARING


                     December 12, 2019
                       11:02 a.m.


       John J. Moakley United States Courthouse
                   Courtroom No. 1
                  One Courthouse Way
              Boston, Massachusetts  02210




                              Kelly Mortellite, RMR, CRR
                              Official Court Reporter
                              One Courthouse Way, Room 3200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com
```

```
 1   APPEARANCES:

 2   On Behalf of the Government:
     Zachary R. Hafer
 3   David G. Tobin
     United States Attorney's Office MA
 4   1 Courthouse Way
     Suite 9200
 5   Boston, MA 02210
     617-748-3106
 6   zachary.hafer@usdoj.gov
     david.tobin@usdoj.gov
 7
     On Behalf of the Defendant Jasiel Correia, II:
 8   Kevin J. Reddington
     Law Offices of Kevin J. Reddington
 9   1342 Belmont Street
     Suite 203
10   Brockton, MA 02301
     508-583-4280
11   kevinreddington@msn.com

12   On Behalf of the Defendant, Genoveva Andrade:
     Charles W. Rankin
13   Rankin & Sultan
     151 Merrimac Street
14   Second Floor
     Boston, MA 02114-4717
15   617-720-0011
     crankin@rankin-sultan.com
16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

(Case called to order.)

THE COURT: Well, I wanted to get you in to get a better read on the schedule here. Because, as I indicated, I try to give real trial dates, and I gave a real trial date, and now that real trial date is being superseded perhaps by a state court case that was scheduled, at least as far as I know, six months after I set the trial schedule here.

So I'll try to be accommodating and reasonable, but you talk about June 1, and the issue with June 1, not that I spend a lot of time talking about my schedule, but my schedule is that I'm going to be out of the country starting effectively three weeks later, and I don't want to be out of the country when a jury comes back in this case.

So I guess the first order of business, it's not really teed up, but is there going to be a motion to sever here?

MR. RANKIN: Yes, Your Honor.

THE COURT: So if I say fine, we'll go forward on the corruption cases first before going to the fraud cases, is that a problem?

And the reason I say it is, in the fraud case we have just one defendant. In the corruption cases, we have effectively five, not merely the two that are in this case but three people who are subject to informations now, and so

1  resolving the criminal culpability of that collection of people
2  is something that at least arguably I'd want to do as quickly
3  as possible.
4          So I raise that as one issue.  Could you be ready for
5  trial in March?
6          MR. RANKIN:  Well, I should have perhaps been more
7  specific about what I'm seeking to sever.  You know, besides
8  the issue of the SnoOwl allegations, which, we don't have
9  anything -- my client didn't have anything to do with, I think
10 that I have an argument to sever from the co-defendant.
11         THE COURT:  I'm just trying to figure out what the
12 schedule is.  I recognize that there are layers of that sort of
13 thing, but let's assume -- then there's the problem of can you
14 prepare for trial if you have to go to trial, so I'm looking at
15 this March date.  I know Mr. Reddington has a very busy
16 schedule, but join the club.
17         MR. RANKIN:  I can be ready for March.
18         MR. REDDINGTON:  Respectfully, Your Honor, I would
19 move anything to be here for you, that's for sure, but my March
20 month is horrible, right up through March, into April.  Is it
21 possible, could it be done sometime in April?
22         THE COURT:  I mean, you know, as I say, I give real
23 trial dates and scheduled other trials.  So after I had
24 scheduled this case for February 24, anticipating three weeks
25 when I was told at the time that there was going to be some

1  additional developments in it, I scheduled after the three
2  weeks a two-week jury trial followed by a one-week jury trial
3  followed by a one-week jury trial.  I say one week,
4  understanding that cases sometimes have a tendency to
5  metastasize and go a little bit longer, and then I have another
6  one-week trial.  And I don't really see any free time until
7  May.
8              MR. REDDINGTON:  Could we do it in May; is that
9  possible?  May 4 is a Monday.
10             THE COURT:  I think so.  Right.  Ms. Beatty, what do
11 you think?  Everybody will be heard from, but I'm just trying
12 to figure out what the range is.
13             So even as we speak, things pop up, but I think you
14 get whatever reliance interests are for those people who
15 thought that they might be on May 4.  Those reliance interests
16 have now been dashed in terms of willingness to do it.  I mean,
17 I can do it on May 4.
18             Now, Mr. Hafer had a startled look on his face here
19 that may inflect the scheduling.  Does it?
20             MR. HAFER:  Your Honor, I'll make it work.  We had a
21 family thing planned for, like mid-May, but I'll make it work.
22 I'm not going to be the fly in the ointment here, so I'll make
23 it work.
24             THE COURT:  All right.
25             MR. HAFER:  Can I just say one thing just to address

```
 1   something you said.  To do that, may I refer -- I don't think
 2   Mr. Reddington has an objection.  We had that sealed
 3   proceeding.  I think technically it's still under seal, and I
 4   previewed for Your Honor the expectation of additional charges.
 5   May I refer to the substance of it?
 6           THE COURT:  Yeah.  I recalled it as being a discussion
 7   in which Mr. Reddington was aware that there was more happening
 8   and other people.
 9           MR. HAFER:  Correct.  I just wanted to address your
10   point because I am with you 100 percent on the dates need to be
11   firm.  At the time that we had the -- and part of what happened
12   on the government's end, in fairness to Mr. Reddington, is over
13   the last, call it six to eight weeks of the ongoing portion of
14   the investigation that led to the additional charges, it got a
15   lot bigger.
16           At the time that we spoke to Your Honor, we really
17   thought it was just going to be one marijuana vendor, one
18   extortion, and it just swirled and it turned into four, and it
19   just became a lot more complex, an order of magnitude bigger
20   than we initially expected.  So that happened on our end.
21           THE COURT:  I mean, I try to be sympathetic, as
22   sympathetic as I'm capable of being to these kinds of issues.
23   On the other hand, as I frequently say, enough about you, what
24   about me?  So now I'm talking about my schedule, if it works.
25           Now, if it doesn't work, that's another matter.  Mr.
```

1  Reddington has generously offered May 4 as a possibility.
2          MR. REDDINGTON:  Absolutely.  I was supposed to go on
3  a family trip to Ireland, which I don't want to go, so that
4  would be perfect.
5          THE COURT:  Frankly, that's probably the only excuse
6  that I would let you go on.  But Ireland will still be there
7  after the trial.
8          MR. REDDINGTON:  That's right.
9          THE COURT:  So we're looking at May 4 here.  I assume
10 Mr. Rankin will be ready by then.  How long really now that the
11 case has, as I indicated cases sometimes do, metastasized?
12         MR. HAFER:  Well, subject to severance issues, I
13 will --
14         THE COURT:  Assume that I'm going to sever the
15 theories of prosecution, that is, sever the fraud, the
16 pre-public official fraud matter from the corruption charges
17 that came thereafter but do the corruption charges first.
18         MR. HAFER:  I tried to spend some time this morning
19 figuring out exactly how many witnesses for each part.  I think
20 the corruption part, my best guess is, call it ten to 15
21 witnesses.  This is a testimony case much more than it's a
22 document case, so I really think we could do, even on a 9:00 to
23 1:00 with --
24         THE COURT:  "Even."  9:00 to 1:00 just moves people
25 along.  If you do 2:00 to 4:00, we have people sleeping in the

1  courtroom.
2           MR. HAFER:  I understand.  I'm saying I think that I
3  am supremely confident that seven trial days, eight trial days,
4  maybe not even that probably.
5           THE COURT:  Okay.  What do you think about that?
6           MR. REDDINGTON:  I agree with that.
7           THE COURT:  And assuming that you're here for argument
8  purposes, Mr. Rankin?
9           MR. REDDINGTON:  I agree with that estimate, yeah.
10          MR. RANKIN:  I don't know enough, we haven't gotten
11 *Jencks* yet, so I don't really have a sense of it, but I'll rely
12 on their estimate.
13          THE COURT:  As I understand it, yours is -- I had as a
14 law school professor for evidence a fellow by the name of Bill
15 McDaniels who is a partner at Williams & Connolly, and I used
16 to take Evidence on Saturday mornings because he was
17 practicing.  So he was, while we were trying the case -- or
18 while he was trying a case in Brooklyn, we were going through
19 the semester.  And he came back after opening statements and
20 said it was a first for him, the opening statements went
21 something like this:
22          Somebody from Williams & Connolly got up, argued.
23 Someone from White & Case got up, argued.  There were five
24 defendants.  You can go through the list.  And then there was
25 one further guy, the least involved, according to the evidence

1   in the case, and his opening statement went something like
2   this: I can't tell you, ladies and gentlemen of the jury, what
3   an honor it is for me, I'm a solo practitioner, my office is in
4   the third floor across the street from Cadman Plaza, what an
5   honor it is for me to be practicing with people from
6   Washington, D.C., people from Wall Street. And who am I? I'm
7   just a poor schmuck, and I represent a poor schmuck, and we
8   don't know why we're here. It's an honor to be here.
9            It was, as it turned out, an effective defense. So
10  you'll think about the strategic dimensions of severance under
11  these circumstances. But without characterizing the defense in
12  any way, you do fall in that category, perhaps recognized by
13  Whitmore as the poor schmuck defense in severance settings.
14           MR. RANKIN: I'm glad the media isn't here to hear you
15  refer to poor Ms. Andrade's lawyer as the poor schmuck.
16           THE COURT: In any event, I'll look at it, but I want
17  to set the timeframe for getting to that.
18           MR. HAFER: I just want to say two things. I know you
19  know this, but I think there are arguments on severance that go
20  to the merits, but I'm just engaging the hypothetical. I'm not
21  conceding.
22           THE COURT: Here is my general view of it. I want to
23  have a motion on severance that covers both aspects of it.
24  "Both" meaning do we try these two arguably different snapshots
25  of Mr. Correia's life in the same case. That's one.

1          The second is, if we sever them, then it's just
2    Mr. Correia in one case and potentially the other named
3    defendant here in that corruption case.  That's another
4    severance argument, but of course it then raises the question
5    of two corruption cases and one fraud case.
6          I'm here every day.  I'll try whatever case I think I
7    have to try, but there is a kind of general argument for
8    consolidation as best I can without compromising the legitimate
9    defense of individuals, and there's another dimension to it
10   that I alluded to, which is, you've got three people hanging
11   out there who are subject to superseding informations.  And the
12   question of sentencing them ought to be timely, I think, and so
13   it becomes timely once that case, the corruption case in which
14   they're involved, is dealt with.
15         I will raise one thing.  You may want to think about
16   it a bit, too.  And that is, as I'm sure -- and I think I've
17   even mentioned it here, all of you are aware, we as a court are
18   trying to come to grips with questions of relatedness in the
19   context of criminal cases.  We have a pretty strict rule of
20   random draw for cases.  But cases come in different sizes and
21   at different times and on different schedules.  And one of the
22   most difficult, I think, issues that is presented by seriatim
23   charges against separate individuals, or even the same
24   individual but generally separate individuals, is that you got
25   one judge who is trying the case and maybe has the center of

1    gravity of the case, and then you have other judges who have
2    generally cooperators, and they are going to be separately
3    sentencing the cooperators, and they don't really know what's
4    happened in the case itself and so can't make the kind of
5    judgment that the judge whose got the main case does.
6         So one of the things we're kicking around is do we
7    change the rule at least to some degree or by some other
8    expedient, try to ensure that cases get before a single judge
9    and the single judge who is going to see most of it.  I know by
10   random draw I ended up with one of the superseding information
11   cases.  Judge Wolf got another one.  And on that other one, the
12   parties have moved to transfer here.  I'm not sure we can
13   transfer.  That's an open question.  But they moved to
14   transfer, saying that belongs in front of Judge Woodlock
15   because he's going to see the whole case.
16        Then there's a case with Judge Zobel.  As to that
17   case, there is a continuance, as I understand it, that's kind
18   of open-ended.  I've not talked to any of the other judges
19   particularly about this, but I'm likely, unless I hear some
20   sort of objection, likely to inquire whether or not they would
21   be agreeable to -- and it's really for Judge Zobel, whether
22   she'd be agreeable to have the cases consolidated in front of
23   me.
24        It's somewhat unusual but not entirely unusual, but in
25   any event -- and I'm not asking for this right now, but say,

```
 1   you know, if you had any objection to it, let me know in, say,
 2   a week from today?
 3            MR. REDDINGTON:  I certainly would have no objection.
 4            MR. HAFER:  I can tell you now we have no objection.
 5   I think it makes sense, Your Honor.
 6            THE COURT:  Mr. Rankin?  This is not a snap quiz or
 7   pop quiz.
 8            MR. REDDINGTON:  I have no objection at all.
 9            MR. RANKIN:  I want to think about it.
10            THE COURT:  Yeah, okay.  So in any event, if you do,
11   just give me a heads up on that because it's something that
12   we're going to be discussing.  I have the flip side of this in
13   another case in which Judge Saris has the main defendant.  I
14   have what appears to be a cooperator.  And my view is that that
15   probably -- and I think hers as well, that probably belongs
16   with her, not me.
17            All I do is wait around until there's a trial or a
18   disposition in the main case, and then I deal with it, probably
19   belongs to the judge who is overseeing it all the time, but it
20   does run across the policy that we've had of random draw here.
21   So I raise that part of it, to be continued.  When can you file
22   a motion to sever?
23            MR. RANKIN:  I think Mr. Hafer and I were talking
24   earlier this week about the possibility of some early
25   disclosure of material that hasn't been disclosed because that
```

```
 1   will be helpful in framing that.  And subject to working that
 2   out --
 3            MR. HAFER:  I'll do it.  I don't want to gum the works
 4   up.  So if Mr. Rankin thinks he's needs *Jencks* and it's not an
 5   insane position in my opinion, we're going to give him the
 6   *Jencks*.
 7            MR. REDDINGTON:  Can I say, "Me too"?
 8            THE COURT:  They were looking right over your head.
 9            MR. RANKIN:  Say, January 10?
10            THE COURT:  That's fine.  I mean, it's not a test of
11   manhood.  I'm not trying to interfere with your holiday, but
12   I'd like to get on to it.
13            MR. RANKIN:  Just so you'll know, there will also be a
14   motion to dismiss on *Kastigar* grounds because her interview was
15   immunized, so that will be coming as well.
16            THE COURT:  Okay.  Just preliminary, is there a
17   contention that that's open, that the -- was it a proffer or
18   something like that session?
19            MR. HAFER:  Yes.  Everything she said was false during
20   the proffer.  We certainly didn't use any of it.  We're happy
21   to -- we'll litigate *Kastigar*, that's fine.
22            THE COURT:  I mean, it's a factual issue now.  It's
23   not just -- they're going to use something they got.  They say
24   -- I think you're saying you're not going to use it unless you
25   start impeaching?
```

```
 1              MR. HAFER:  Other than, to the extent we need to prove
 2    a false statement --
 3              THE COURT:  Right, right.  Okay.  So those two, are
 4    they the sum of the likely pretrial motions?
 5              MR. RANKIN:  I think so, yeah.
 6              THE COURT:  So then we'll get those on the 10th of
 7    January.  And the government will respond by, I'll say the
 8    31st, which is three weeks, but just so we've got an
 9    understanding of it, and I'll try to get it set down promptly.
10              Now, are there other -- assuming instrumentally that
11    we're going in the direction of a trial involving both
12    defendants now before me only on corruption in May, is there
13    anything else on the horizon that I should know about?  I know
14    you've got an appointment with Judge Cabell, too.
15              MR. HAFER:  I'm pretty comfortable that there's not
16    going to be additional charges that would impact that.
17              THE COURT:  But that or anything else that uses the
18    rule of thumb will keep me up at night if I know about it.
19    Anything like that in the case?
20              MR. HAFER:  Not that I'm aware of at this time.  On
21    that point, when we produced *Jencks*, it's my practice to sort
22    of do a binder separate.  Some of your colleagues, Your Honor,
23    like to get that binder when we produce it to have it on the
24    assumption it's a trial.  I'm happy to do that or not if you
25    don't want --
```

1      THE COURT:  It's up to Mr. Rankin if he wants me to
2 see it at this point or not.  It's up to you.  I'm a member of
3 the clean plate club.  I consume everything that's put in front
4 of me.
5      MR. RANKIN:  I think I'd like to have a preview of it
6 before I agree.
7      THE COURT:  To the degree it's not relevant,
8 immediately relevant to the motion at hand, I don't want to see
9 it unless Mr. Rankin says he doesn't care.  He'll stand up and
10 say, "There's nothing there so why would you even be concerned
11 about it."  But in any event, anything else that we need to
12 talk about?
13      MR. HAFER:  Just that I know Mr. McDaniels very well.
14 I summered at Williams & Connolly, and then Bill tried *Sampson*.
15      THE COURT:  Yes, I know.
16      MR. HAFER:  He's a great man.  He's a great guy.
17      THE COURT:  It was the perfect way to take evidence.
18 Less focus on -- because the federal rules were just being
19 enacted at that time, less focus on the federal rules and more
20 on common sense, which is frequently helpful in evidentiary
21 rulings.  And lots of war stories, which is what I was looking
22 for on Saturday mornings when I was in law school.
23      Anything else we need to talk about then?  So that's
24 the schedule.  Defend the utmost, Mr. Reddington, your
25 schedule, and in that connection understand that I'm prepared

```
1   to talk to any superior court judge who has other ideas about
2   your time here.  We do have a rule about the age of the case,
3   but frankly the process of trying to pull everybody together
4   here is such that I may pull rank on it.  I hate to do it, but
5   I may.  Okay?
6            MR. REDDINGTON:  Okay.  Thank you.
7            MR. HAFER:  Thank you, Your Honor.
8            THE COURT:  We will be in recess.
9            (Adjourned, 11:23 a.m.)
```

```
 1                CERTIFICATE OF OFFICIAL REPORTER
 2
 3         I, Kelly Mortellite, Registered Merit Reporter
 4  and Certified Realtime Reporter, in and for the United States
 5  District Court for the District of Massachusetts, do hereby
 6  certify that the foregoing transcript is a true and correct
 7  transcript of the stenographically reported proceedings held in
 8  the above-entitled matter to the best of my skill and ability.
 9         Dated this 21st day of June, 2021.
10
11                /s/ Kelly Mortellite
12                _____
13                Kelly Mortellite, RMR, CRR
14                Official Court Reporter
```