UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,      )
                              )          Criminal Action
          Plaintiff,           )          No. 18-10364-DPW
                              )
v.                             )
                              )
JASIEL F. CORREIA, II,         )
GENOVEVA ANDRADE,              )
                              )
          Defendants.          )
                              )
```


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


MOTION HEARING
TELECONFERENCE


APRIL 6, 2020
9:01 a.m.


John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts  02210




Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Zachary R. Hafer
3    David G. Tobin
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3106
6    zachary.hafer@usdoj.gov
     david.tobin@usdoj.gov
7
     On Behalf of the Defendant Jasiel Correia, II:
8    Kevin J. Reddington
     Law Offices of Kevin J. Reddington
9    1342 Belmont Street
     Suite 203
10   Brockton, MA 02301
     508-583-4280
11   kevinreddington@msn.com

12   On Behalf of the Defendant Genoveva Andrade:
     Charles W. Rankin
13   Rankin & Sultan
     151 Merrimac Street
14   Second Floor
     Boston, MA 02114-4717
15   617-720-0011
     crankin@rankin-sultan.com

16

17

18

19

20

21

22

23

24

25

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | P R O C E E D I N G S                                                    |
| 2  | COURTROOM CLERK:  I'm going to go ahead and announce                     |
| 3  | the case.  Criminal Action 18-10364, *United States v. Andrade*          |
| 4  | *and Correia*.                                                            |
| 5  | THE COURT:  This is Judge Woodlock.  We're conducting                    |
| 6  | this as a teleconference in light of the difficulties that are           |
| 7  | created by the coronavirus issue.  I view the hearing as one             |
| 8  | that does not necessarily need the attendance of the                     |
| 9  | defendants, but I want to understand from Mr. Reddington and             |
| 10 | then from Mr. Rankin what your client's disposition is about             |
| 11 | sitting in on this conference.  Mr. Reddington?                          |
| 12 | MR. REDDINGTON:  Yes, Your Honor.  Good morning.  Mr.                    |
| 13 | Correia is well aware of the fact that we're conducting this             |
| 14 | teleconference and does not wish to participate and is relying           |
| 15 | on me in conveying his position to the court.                            |
| 16 | THE COURT:  All right.  Mr. Rankin?                                      |
| 17 | MR. RANKIN:  Your Honor, I believe Ms. Andrade is on                     |
| 18 | the phone.                                                               |
| 19 | THE COURT:  All right.  So she's prepared to listen in                   |
| 20 | on the conference itself.  She will not have a speaking part             |
| 21 | unless you specifically ask me to acknowledge her.  The only            |
| 22 | people that I understand will have a speaking part are                   |
| 23 | Mr. Hafer, Mr. Reddington and Mr. Rankin.                                |
| 24 | I note also that there is a person from the news                         |
| 25 | media, from the Herald News present.  I don't know if there are          |

 1   any other news media personnel here, but I want to emphasize

 2   that the rules of the court require that there be no recording

 3   or other means of capturing this event by outsiders other than

 4   through the use of listening and writing it up.

 5          The only correct recording and reporting of this

 6   proceeding is that done by the court stenographer.  And in

 7   order to protect that process, I'm going to require that there

 8   be full compliance with that directive, that is that there be

 9   no recording by any other person.  Mr. Goode, do you understand

10   that?

11          PHONE VOICE:  I'm a woman.

12          THE COURT:  I'm sorry.  That's one of the many

13   problems with teleconference.  But Ms. Goode, do you understand

14   that?

15          PHONE VOICE:  I do understand.  I would just like a

16   clarification.  I do have credentials, and in the past I've

17   been able to, in realtime, go on social media.  I did plan on

18   going on Twitter for this.  I've done it in the past.  I just

19   want clarification.

20          THE COURT:  Yes.  No, I'm not going to permit it.

21          PHONE VOICE:  You're not going to permit it?  Okay.

22          THE COURT:  I'm not going to permit it.  You're not in

23   the courtroom itself, and consequently your access is somewhat

24   limited in a way that would be distorting.  If we use Twitter,

25   it would amount under these circumstances to the effect of

1    equivalent of a recording.  As a consequence, I'm not going to

2    permit it.

3            But with that limitation, first, do you understand it;

4    and second, are you prepared to adhere to it?

5            PHONE VOICE:  I do understand and I am prepared to

6    abide by your order.

7            THE COURT:  Okay.  Thank you very much.

8            So let me go to the initial question, for me anyway,

9    which is the question of severance.  As I see the back and

10   forth here, the state of the play is this:  that the government

11   acknowledges that if this case goes forward with respect to

12   both Ms. Andrade and Mr. Correia, that there should be

13   severance at least as to the fraud counts, those are

14   essentially Counts 1 through 13, between the parties.

15   Ms. Andrade would not be on trial or tried in a joint trial

16   that dealt with the fraud counts.

17           Do I have that correctly, Mr. Hafer?

18           MR. HAFER:  You do, Your Honor.

19           THE COURT:  Okay.  And so for that reason I'm going to

20   sever as to the charges.

21           Now, I want to get to the second issue so that I

22   understand it more fully because it's inflected by the *Kastigar*

23   question, and that is this, and I want to know whether or not

24   either of the parties have or any of the parties have a view.

25   My understanding, but it's not fully researched here, is that

1    if the case went solely in respect of Mr. Correia, that is, we

2    had three severances, one Mr. Correia from Ms. Andrade for the

3    so-called corruption scheme; second, that would mean

4    Ms. Corriea's -- Ms. Andrade is separately tried for the

5    corruption scheme herself; then third, there would be a trial

6    against Mr. Correia for the fraud scheme.

7              Assuming that, which I don't necessarily embrace at

8    this point, but assuming that, is there any question that Mr.

9    Correia is not in a position to assert whatever *Kastigar* rights

10   Ms. Andrade has?  Mr. Hafer?

11             MR. HAFER:  I think that's right, yes, Your Honor.  I

12   hadn't thought of that, but that makes sense to me, yes.

13             THE COURT:  Well, what makes sense is and what's in

14   the law may be another matter.  But in any event --

15             MR. HAFER:  I'm sorry.  Yeah, I understand, yes.

16             THE COURT:  But in any event, I think it's a matter

17   that I will ask the parties to look at.  I want you to, as a

18   legal research project, I will ask Mr. Reddington if he has a

19   view about that, other than what he would prefer as opposed to

20   what the law might require.

21             MR. REDDINGTON:  Well, obviously it would be a

22   derivative right.  As you say, it's something that really --

23   just like Zach, I really had not examined it from that point of

24   view.  I saw Charlie's motion obviously in the brief and the

25   response and the reply.

1          It is arising out of the initial investigation or the

2     same investigation, so I would probably like the opportunity to

3     look into that to see if I have any derivative rights based on

4     the *Kastigar* issues that have been raised.

5          THE COURT:  Right, and of course you will.

6     Mr. Rankin, I'm not sure as to this aspect of it you have a

7     special interest.  I know your view is that, however this case

8     is parsed up, that Ms. Andrade has her *Kastigar* rights, which

9     may be sufficient to cause the case to be dismissed.  But on

10    the question of whether or not another party has the right to

11    assert Ms. Andrade's *Kastigar* rights, do you have a view one

12    way or the other?

13         MR. RANKIN:  This is --

14         MR. REDDINGTON:  I'm sorry.  Go ahead.

15         MR. RANKIN:  -- Charlie Rankin.  This is an issue I

16    had not thought about, and I'd like a chance to think about

17    that and do some research.  It's not apparent to me that

18    Correia would have limited rights for Ms. Andrade's *Kastigar*

19    protection.

20         THE COURT:  Okay.  Let me -- I will set a time period

21    for response, but I want to use that as a way of trying to

22    structure trial.  I understand first that timing is uncertain

23    altogether for all of us, but we've had the issue before very

24    busy trial counsel and a need for me anyway to get on the dance

25    card I guess for trial counsel.  Preliminarily I understand

1    from Ms. Beatty that the parties don't think that

2    realistically, given other commitments, assuming that trials

3    are going to be possible in September, that September would be

4    the earliest date that you're available.  Is that correct?

5            MR. HAFER:  Your Honor, Mr. Hafer here.  I think so.

6    We could do it earlier.  Mr. Rankin and Mr. Reddington -- I

7    mean, "we" being the government.  But Mr. Rankin,

8    Mr. Reddington and I have spoken at length on this and trying

9    as best anyone can to project out where things are going.  Our

10   thinking was we wanted to go as far out as we could without

11   going too far to have a reasonably attainable trial date based

12   on the most current information.  And any backlog that's going

13   to be created by all the continuances and presuming in-custody

14   defendants are going to go first, so we were trying to get on

15   as soon as we could.  That was also reasonable given this

16   uncertain time we're in, so we were going to propose September

17   14 to Your Honor.  So that would be a real date, and we could

18   sort of work backwards from that.

19           THE COURT:  Okay.  So let me just talk about real

20   dates.  It's a real date for me.  The question is whether it

21   will be for counsel and, again, assuming that it is possible to

22   bring jurors in on September 14.

23           With respect to Mr. Reddington in particular, I know

24   you have a busy trial schedule, but this is a date that I would

25   want you to defend against all-comers because it's been set

1    sufficiently in advance to permit preparation and the ability

2    of all parties to proceed.

3            Is there any question about the vulnerability of that

4    date, Mr. Reddington?

5            MR. REDDINGTON:  No.  Actually, when I spoke with

6    Zach, we did discuss the possibility of September 14.  And

7    looking at my calendar, I do have a custody murder case coming

8    up.  It's not for two weeks after that, so I would be available

9    on September 14.

10           THE COURT:  Well, the assumption then would be that

11   the trial would only be two weeks.  Is that a fair assumption?

12   And let me propose two different alternatives.  One is that the

13   trial is solely against Mr. Correia, and, consequently, I would

14   not sever the two separate claims against him.  So how long

15   would that trial be?

16           Second, assume that I do sever and start with the

17   issue of -- sever solely as to Mr. Correia and I start with the

18   issue of corruption.  So two alternatives on the decision tree.

19   One, a trial of all that is indicted in the current indictment.

20   Second, one that involves really only or excludes Counts 1

21   through 13.  What's the timing from your perspective,

22   Mr. Hafer, of those two alternatives?

23           MR. HAFER:  Certainly, Your Honor, trying solely

24   Counts 14 to 26 with the -- I'm starting with the second of the

25   two choices.

1          THE COURT:  Right.

2          MR. HAFER:  I'm very confident we can get that in in

3     under two weeks or up to and including two weeks but not more

4     than two weeks.

5          THE COURT:  That's for both sides on your present

6     understanding?

7          MR. HAFER:  Yes, Your Honor, correct.  I think in my

8     preliminary conversations with defense counsel, I kind of have

9     in the area code seven to eight trial days as to the

10    corruption, and I think we could probably do better than that.

11    There aren't hundreds of exhibits in this case.  You know,

12    there are probably, for the corruption portion of the case, no

13    more than 20 witnesses, some of whom are very, very quick

14    direct.  Neither Mr. Rankin nor Mr. Reddington have reputations

15    for, you know, unnecessarily lengthy cross-examinations, so I'm

16    certainly confident we could do under two weeks on the

17    corruption portion of the case assuming both defendants.

18          So for one trial, just Mr. Correia, all 26 counts, I

19    think that would be close, but if we had to, and as long as

20    there were some opportunity perhaps, Your Honor, for a couple

21    of longer trial days, I think we could do that, too.

22          THE COURT:  All right.  Mr. Reddington, as to the

23    entire indictment but solely against you, how would that go?

24          MR. REDDINGTON:  That would include -- that would be

25    Counts 1 through 26, right?

1          THE COURT:  Right, right.

2          MR. REDDINGTON:  I would agree with Mr. Hafer's

3    assessment on that --

4          THE COURT:  Okay.  I'm sorry to interrupt you.  Is

5    that then defensible?  With the custody murder trial starting

6    two weeks thereafter, can you be assured that you're going to

7    be able to continue with this trial, finish it, and begin the

8    next trial in a fashion that will not unduly disturb the

9    superior court?

10         MR. REDDINGTON:  Yes, because once I impanel with you,

11   we then obviously would notify or well before that would notify

12   the Fall River court and obtain a new date on that to maybe

13   move it out a week or two just to get that buffer.

14         THE COURT:  Right.  Okay.  So what I'd like to do is

15   secure the September 14 date for Mr. Correia.  Now, it ties

16   back into the question of severance that I outlined before,

17   that there could be as many as three trials here, three

18   different trials.  But I think that if it were to be severance

19   of Ms. Andrade and Mr. Correia, I probably would want to try

20   the entire case against Mr. Correia at the same time.

21         MR. REDDINGTON:  That would be my preference as well,

22   Judge.

23         THE COURT:  Okay.  So then let me turn to whether or

24   not the parties have a view, that is Mr. Rankin and Mr. Hafer,

25   of that as preferable to other alternatives, that is, that

1    severing out Ms. Andrade -- assuming that there are *Kastigar*

2    reasons for doing so, but severing out Ms. Andrade and trying

3    just Mr. Correia first is the most preferable of a number of

4    unpreferable kinds of matters.

5         I see with the filings of Ms. Andrade and the

6    government as well that everybody would like to have the most

7    efficient way of dealing with these charges.  The most

8    efficient way, apart from the rights of the parties, which of

9    course trump everything, most efficient way would be one trial.

10   That would be in some ways my preference.  But failing that,

11   which I think we would, the trial against Mr. Correia, assuming

12   that Ms. Andrade has to be severed out on all counts, is

13   probably the most preferable.

14        Is that your view as well, Mr. Hafer and then

15   Mr. Rankin?

16        MR. HAFER:  Your Honor, the government's view is that

17   Mr. Correia and Ms. Andrade should be tried together on the

18   corruption counts.

19        THE COURT:  Right.

20        MR. HAFER:  That would be the -- that would be the

21   best of the -- at this point what we agree are the legally

22   defensible options.  That is, the government's view is that

23   Ms. Andrade shouldn't be tried on Counts 1 through 13 --

24        THE COURT:  Okay.  So your preference is joint

25   corruption trial of Ms. Andrade and Mr. Correia.  I understand

1   that.  Assuming that that's for whatever reason not going to be

2   possible, is the trial of Mr. Correia for all counts in the

3   indictment the next most preferable?

4           MR. HAFER:  Yes, Your Honor.

5           THE COURT:  Okay.  Mr. Rankin, how about you?

6           MR. RANKIN:  So the question is do I prefer to have

7   Ms. Andrade -- it's Andrade, not Andrade.

8           THE COURT:  Excuse me.

9           MR. RANKIN:  That's okay.

10          THE COURT:  I have trouble with my own name, as you

11  know.

12          MR. RANKIN:  I'm not going to go there.  She would

13  prefer to be tried by herself on the corruption charges and let

14  Mr. Reddington go to trial on all his charges.  I think that's

15  the upshot of our motion to sever.

16          I also think that it's -- that the trial of her, if

17  there needs to be one on the corruption charges, would be

18  considerably shorter than the trial of Mr. Corriea's corruption

19  charges because of the -- well, for the reasons we've talked

20  about in the papers.

21          THE COURT:  Right.  In that connection, one thing that

22  I would be concerned about is simply the buffer between the

23  trial of Mr. Correia and the trial of Ms. Andrade, is it, so

24  that any publicity that's associated with the trial of Mr.

25  Correia is a little bit dissipated.  I'm making the assumption

1     that the first case to go to trial would be Mr. Correia.  So I

2     have that in mind.

3          Now, let me wheel back to the *Kastigar* issues here.

4     I've read the papers as carefully as I can.  I'm still in a

5     state of some uncertainty about how the government would

6     respond to the reply of Ms. Andrade.  The reply of Ms. Andrade

7     is fairly specific, deals with I think some contested issues of

8     fact.  When there are contested issues of fact, then it's

9     necessary to have a *Kastigar* hearing as far as I'm concerned

10    choosing some language that's different from the catechisms

11    that are frequently invoked without much thought about what

12    requires a *Kastigar* hearing and what doesn't.

13         There is sufficient colocation of events to raise

14    questions.  I wouldn't, however, want to order a hearing, a

15    *Kastigar* hearing, until the government had one last opportunity

16    because they bear the burden of rebutting the force of

17    Ms. Andrade's reply.

18         Now, Mr. Hafer, do you have a view with respect to

19    that?

20         MR. HAFER:  Yes, Your Honor.  Two things.  I thought

21    about filing a sur-reply.  If that would be helpful, I'd like

22    do that.  I'm also prepared to preview some of what I would say

23    in that sur-reply, but it sounds to me like it would be helpful

24    to have something in writing.  So I would ask, knowing that

25    that's your view, I would ask for the opportunity to do that.

1     But I can also, I don't find it as forceful I think as it was

2     framed by Mr. Rankin, and that's ultimately why I chose not to

3     file anything.

4          THE COURT:  Right.  I ordinarily don't invite people

5     to file sur-replies and that sort of thing.  But I've tried to

6     look at this from the prospective of whether or not I would be

7     comfortable denying a *Kastigar* hearing and simply moving on the

8     papers or acting on the papers.  I don't think I would be at

9     this point.  And so that's why I say that I will afford you the

10    last -- I say "the last," I mean we're close in papers on this

11    one -- the opportunity to respond to that so that I can deal

12    with this fully informed with the government having a full

13    opportunity to direct my attention to evidentiary matters.

14         Now, that brings me to a second level of question.

15    There is repeated in the papers the assumption that there is

16    ongoing discovery in the case.  Mr. Rankin, is there anything

17    that you have received since the filing of these papers that

18    you would like to incorporate in the record?

19         MR. RANKIN:  No, not yet.  Although I have to say that

20    I haven't fully gone through everything that's come in.

21    Mr. Hafer has been very good about giving us material, and

22    we're still going through it.  There certainly are issues that

23    would come up at a *Kastigar* hearing I think that are not

24    briefed.  I mean, I wouldn't want to telegraph what some of my

25    contentions would be.  I'd rather have --

1          THE COURT:  Well, let me tell you, I think I

2    understand the strategic issues that are presented.  Let me put

3    it a little bit differently.  I'm thinking of this more or less

4    in the framework that you see in the civil side of motion for

5    summary judgment, that is, that the government's position is

6    you don't have to have a hearing.  Because there are no genuine

7    issues of material fact here, you can do it on the papers.

8    That at least is the framework that I would look at and address

9    this from.

10          So the question is to raise a genuine issue of

11    material fact such that it's necessary to have a *Kastigar*

12    hearing of some breadth.  The breadth of course would be

13    another issue that we'd have to take up.  On the one hand, that

14    may create strategic issues, that is to say, if you don't

15    telegraph something, I don't know it exists.  On the other

16    hand, I don't think that's so overwhelming in this contest.

17          *Kastigar* is, to some degree, a movable feast.  That is

18    to say you take it up all through the course of the proceedings

19    and right up to trial itself and maybe even after trial to

20    determine whether or not there is a taint.

21          But I want to get my hands around this fully as early

22    as possible because it influences my view about what the nature

23    of the trial might be.  The two choices really are at this

24    stage the choice offered by Mr. Reddington as his principal

25    one, which is to try all charges against Mr. Correia

1    immediately -- not immediately but together, irrespective of

2    what happens to the severance matter and the view of the

3    government that they would like to proceed against both

4    defendants on the corruption matter first.

5          In order for me to decide between those two

6    alternatives, which I think are at least initial alternatives,

7    I want to be clearer about what the *Kastigar* issues are.  So I

8    would propose to have additional writings.  I'd determine

9    whether or not there is a reason for a *Kastigar* hearing on the

10   basis of the documents that are provided to me and then make

11   the decision about whether it's a joint trial between the two

12   defendants or a sole trial involving all counts against Mr.

13   Correia and then proceed from there.

14         Now, one of the values of a sole trial against Mr.

15   Correia goes back to the earlier question that I raised about

16   whether or not Mr. Correia has any standing to exclude any of

17   the materials that are raised in a *Kastigar* context by

18   Ms. Andrade.  That's something I'd learn a good deal more about

19   in a trial.  That would bring it up to date.  It would

20   presumably demonstrate more clearly what's at issue from a

21   *Kastigar* point of view because evidence would actually be

22   adduced that could not otherwise be adduced if Ms. Andrade went

23   on her own, and I might think about having a hearing in the

24   afternoon -- assuming a morning schedule for the trial -- a

25   hearing in the afternoon that touched on any *Kastigar* issues

1    that arose during the course of the trial solely against Mr.

2    Correia.

3         Those are at least ways of trying to continue to

4    update myself and inform myself about the question of whether

5    or not there should be a joint trial with corruption against

6    both defendants first or simply a trial involving all charges

7    against Mr. Correia alone first.

8         In any event, it's this ongoing thought that I have

9    about recognizing that I'm taking a snapshot of the state of

10   the evidence at any particular point.  The first snapshot I

11   want to take is the one that arises on the papers as completed

12   by the parties on the motion to sever.

13        I will assume that and tell you that you must present

14   everything that raises a *Kastigar* issue at this point on the

15   papers.  And then that becomes the baseline against which I

16   evaluate additional evidence of *Kastigar* problems.  So the

17   incentive structure obviously is to give us the best

18   information the parties have about the *Kastigar* questions

19   because failing to do so will put the parties in an adverse

20   position in further *Kastigar* evaluations.

21        So I think I come then to the question of timing here.

22   Mr. Rankin, how much time do you need to fully evaluate the

23   current state of the record from the government and to file any

24   additional materials?  They can be argument in the sense of

25   argument from particular documents, but to do that and say this

1    is where we stand at this point?

2          MR. RANKIN:  Well, I guess I would ask for 30 days,

3    Your Honor, not because normally it would take that long but

4    just given the fact that we're spread all over Eastern

5    Massachusetts and we're not working in the same spot, I think

6    it would -- I'd like to ask for three days.

7          THE COURT:  Right.  That does not seem unreasonable to

8    me.

9          MR. HAFER:  I don't object, Your Honor.  We'll react

10   off whatever Mr. Rankin --

11         THE COURT:  Right.  So that would mean that Mr. Rankin

12   would be responding, let's say by no later than May 8, and then

13   I would provide the government with -- is two weeks sufficient?

14         MR. HAFER:  That's fine, Your Honor.  That's fine,

15   thank you.

16         THE COURT:  So May 22 for the government.  That will

17   close out the written materials on that, and then I'll work my

18   way through, as I am now, or have, and try to have a

19   conference, I won't call it a hearing because a hearing takes

20   on a term of art in the *Kastigar* context, but have a conference

21   with respect to that to see whether or not there are on this

22   state of the record as it exists at that point genuine issues

23   of material fact.

24         I use language obviously from the civil side to convey

25   the idea that you resolve things on papers unless there's some

1    showing that there's a necessity for evidentiary evaluation,

2    and that will frame what I'm thinking about.

3              Consequently, Mr. Rankin, obviously you should be

4    prepared in any event to be going to trial on the 14th,

5    September 14th.  I will however have a backup date for you, and

6    the backup date that I would use is, well, November 9th.  That

7    would be a case solely, on this assumption, solely involving

8    Ms. Andrade.

9              Is that an agreeable date for you and for the

10   government?

11             MR. RANKIN:  That's fine for me.

12             MR. HAFER:  Yes, Your Honor, that's fine for the

13   government.

14             THE COURT:  Okay.  So that's the backup date, assuming

15   that we have full severance of Mr. Correia and Ms. Andrade.

16             Now, let me --

17             MR. RANKIN:  Your Honor, can I interrupt and step back

18   to one other issue?

19             THE COURT:  This is Mr. Rankin?

20             MR. RANKIN:  Yes, Your Honor.

21             THE COURT:  We can more or less understand the names,

22   but sometimes it's necessary for either Ms. Mortellite or me to

23   ask for the name.  This time it was me asking for the name.

24   Ms. Mortellite is much more adept in picking up voices.  But

25   now I know who --

1          MR. RANKIN:  This is Charlie Rankin.  Any time there's

2     a southern accent, that's me.

3          THE COURT:  Right, okay.

4          MR. RANKIN:  Going back to the sequence of written

5     material on this *Kastigar* issue, we filed the original motion.

6     The government responded.  We filed a reply.  Whatever disputes

7     we have, I think everyone agrees that it's the government's

8     burden to prove that there was no taint or no *Kastigar*

9     violation.  So I would think it would make sense for the next

10    pleading to come from the government to show why there is no

11    taint and then for us to have a rebuttal as to why a hearing is

12    required.

13         THE COURT:  Right.  I think that that has a

14    superficial but not substantial dimension of commending itself.

15    Superficially, it sounds like the question of resolving

16    Alphonse and Gaston.  But fundamentally, the issue for me is to

17    understand by ordering proof where the potential questions of

18    material fact might exist.  And so the way in which I've set it

19    up will do that.

20         At the conference, I'll of course ask if there's

21    anything further, that is to say whether or not the defendant

22    will offer orally a sur, sur, sur-reply, but we have to come to

23    conclusion at some point.  I don't believe that the government

24    has had the full opportunity to address, because ordinarily we

25    wouldn't have a sur, sur-reply here, all of the contentions of

1   the defendant that have been raised so far.  So this is the way

2   I've ordered the proof.  I understand your argument.  I just

3   reject it.

4          So that's how we'll be dealing with the question of

5   whether or not we have a formal *Kastigar* motion that is an

6   evidentiary motion to determine whether or not there is taint

7   of some sort here or use of some sort here that's prescribed by

8   *Kastigar* by the government in its prosecution of Ms. Andrade.

9   And that will sharpen the issues I think most successfully for

10  me for resolution of that issue, at least at the first stage,

11  providing at the first stage a benchmark and a way of

12  evaluating any further developments in the case.  So I've got

13  that in that order.

14         Now let me turn to a related case, no pun intended,

15  but there are three other cases that are potentially related in

16  which the defendants have pled guilty and are awaiting

17  sentencing.  One of them was drawn to me.  That's *Costa*.

18  They've all been drawn by random draw as I understand it, but

19  one, *Costa*, drawn to me; another, *Camara*, in which the parties

20  have asked that it be transferred to me.  It was originally

21  drawn to Judge Wolf and has been transferred to me with the

22  agreement of those parties.  And there's one other, and that's

23  *Hebert*, which is before Judge Zobel.

24         One of the issues that's always raised in this area is

25  the difficulties of having multiple defendants alleged to have

1    been involved in the same scheme or fraud sentenced by

2    different judges.  And it's a matter of some concern to the

3    court generally and something that the court is thinking about

4    carefully because it has to be balanced against the adherence

5    that the court has to the general principle of random draw.

6         But that having been said, it seems in this case to

7    make a good deal of sense to have all of those so-called

8    related cases, I will call them related cases, though I

9    recognize that's a term of art as well that may carry some

10   additional baggage, but those related cases all before me.

11   That leaves only *Hebert*.

12        I've had just the most general of discussions with

13   Judge Zobel about it.  I think that both of us would be

14   prepared to receive from the parties in those cases, of course

15   it's the government in that case as well as in this, but

16   Mr. Hebert's counsel, a statement of view about whether or not

17   there should be a transfer over to my docket.

18        My view is that one of the things that I think about

19   in scheduling -- although I think we've gotten beyond that

20   because the principal parties that I'm concerned about are the

21   parties who are going to trial, but one of the things I'm

22   concerned about in scheduling is that these three defendants be

23   promptly sentenced, and that can only take place, as far as I'm

24   concerned, after the corruption trial takes place, at least the

25   corruption trial of Mr. Correia.  Maybe the corruption trial of

1    both, corruption trials or trial of both.

2            In any event, I raise it because I want to be sure

3    that the defendants before me have nothing -- I shouldn't say

4    be sure they have nothing -- to see whether you have anything

5    to say about the question of whether or not Judge Zobel and I

6    should solicit from the parties in *Hebert* whether or not they

7    wish to transfer the case to my docket for purposes of

8    sentencing.  So do the parties have any view about that?

9            MR. HAFER:  Your Honor, this is the government.  To

10   the extent you're asking me, I certainly have no objection.  I

11   think it would turn on Mr. Bailey who represents Mr. Hebert,

12   but I certainly have no objection.

13           THE COURT:  Absolutely, and so I wanted to understand

14   whether or not, Mr. Reddington or Mr. Rankin, you have anything

15   that you want to offer on that issue.  I'm not sure that you,

16   to use the traditional language of standing, have standing

17   here, but I want to be fully informed about any concerns that I

18   might not have fully considered here about that matter.

19   Mr. Reddington?

20           MR. RANKIN:  This is Charlie Rankin.  I don't have any

21   objection to seeing if Mr. Hebert wants to go from Judge

22   Zobel's session to your session.

23           THE COURT:  Okay.  Mr. Reddington?

24           MR. REDDINGTON:  Yes, I feel the same way.

25           THE COURT:  Okay.  So I think I may initiate a more

1    formal process with Judge Zobel as I think Mr. Hafer probably

2    says the real issue is considerations of Mr. Bailey and his

3    client as to this issue.

4         Now, I think that deals with most everything that we

5    need to take up at this point or can reasonably take up at this

6    point.  I think I may have mentioned -- and let me be a little

7    bit clearer about it.  So that we've got a full understanding

8    of what a case severed between Counts 1 through 13 and 14

9    through 26 might look like, I've done a preliminary markup, and

10   I think I will do a more complete markup of an indictment form

11   that would be presumably submitted to the jury in a joint

12   corruption case involving Mr. Correia and Ms. Andrade.  Of

13   course the government has the file in this, that is the

14   document file on this.  I think it would be helpful if you

15   could send it to me if that's possible.  Maybe you don't want

16   to do it that way.

17        MR. HAFER:  I'm happy to do it, Your Honor.  I'm happy

18   to do it.

19        THE COURT:  Just so I can give you a redline of what I

20   think it might look like, and the parties can look at it, and

21   we can be thinking about how the severed indictment might look

22   for trial purposes.  This is something I've done on a number of

23   occasions with severed cases.  It may involve some new

24   language.  I don't think it should, but it may.  It certainly

25   would involve a little bit of reorganization and of course

1    renumbering so that there would be a concordat that shows the

2    counts as indicted, which are in the use of numbers spelled out

3    as opposed to what I would do, which is arabic numbers for the

4    various counts or newly renumbered counts.  But I'll try to do

5    that as well as I think through what the separate cases might

6    look like, and I will circulate that at some point in the next

7    30 days through Ms. Beatty by email, and you can all respond to

8    it by email before that gets put in concrete but at least to

9    get you thinking about what the separate trials might look

10   like.

11          If the assumption is correct or the working hypothesis

12   is correct that there's going to need to be a formal

13   evidentiary hearing with respect to the *Kastigar* matters, I

14   assume that it will be conducted at some point starting in --

15   not starting but at some point in June or thereafter, and it

16   may or may not be the case that Mr. Reddington has on behalf of

17   his clients some rights to participate.

18          Of course I'd like to be sure that he has the

19   opportunity to observe what's going on, and it may also be that

20   it's the kind of hearing that we may have to, depending on what

21   our Covid-19 circumstances are, that we have to do by

22   videoconferencing.

23          MR. RANKIN:  Your Honor, can I just interrupt?

24          THE COURT:  Yes.

25          MR. RANKIN:  This is Charlie Rankin.  Maybe you

1    misspoke.  You said you wanted Mr. Rankin to be able to

2    participate?

3              THE COURT:  No.  If I did -- and there's no question

4    in my mind, if you think I did, I did say "Mr. Rankin" instead

5    of "Mr. Reddington."  I'm questioning Mr. Reddington --

6    although we're going to learn about that, and in that

7    connection I think I'd like to have briefing by the parties or

8    a statement of position by the parties.  Let's put that as due

9    by April 17.  I think that's sufficient time, even in those

10   Covid-19 diaspora periods.

11             MR. HAFER:  Your Honor, Mr. Hafer here.  That's on

12   the limited issue as to whether Mr. Rankin can assert sort of

13   the derivative *Kastigar* rights?

14             THE COURT:  Mr. Reddington can.

15             MR. HAFER:  Pardon me, yes.

16             THE COURT:  I caught it myself.  I'm much more

17   critical of others than I am of myself, I guess.

18             So if you can have that, it would be helpful.  But

19   back to that issue, I would like, obviously, to have

20   Mr. Reddington, even if he doesn't have formal rights, to be

21   able to observe as he chooses.  And we'll try to set up a

22   schedule concerning that.  But I'd like the parties at least to

23   be thinking about what kind of time and when might be used to

24   deal with a *Kastigar* hearing, formal evidentiary hearing if it

25   takes place.

```
 1              And as I said, I think it would be best for all so
 2     that planning could be successful to think by the middle of
 3     June we'd start that process.  Whether other cases are going to
 4     be up and running, whether the Fall River Superior Court is
 5     going to be re-juggling its schedule is something of course
 6     beyond my control.  But at least I'd like you to be thinking
 7     about your availability starting mid-June on the assumption,
 8     again, a working assumption just as a way of being sure that
 9     we've thought about all the dimensions of this, that we have a
10     formal *Kastigar* hearing of some dimension.
11              Now, is there anything else that we should take up?
12              There is one thing that's ex-parte with
13     Mr. Reddington.  I think the ex-parte motion that you've made,
14     Mr. Reddington, is at this point premature until we get a
15     better handle on the trial date, and my inclination would be
16     simply to deny it without prejudice to it being renewed when we
17     get a formal trial date that would be reliable enough to
18     provide a foundation for that ex-parte motion, another further
19     ex-parte motion.  Does that work for you?
20              MR. REDDINGTON:  Yes, I agree with that, Judge.
21              THE COURT:  Okay.  So back to --
22              MR. RANKIN:  Your Honor, Charlie Rankin again.
23              THE COURT:  Yeah.
24              MR. RANKIN:  Earlier in our conference today you said
25     or I thought you said after we file our additional *Kastigar*
```

1      written material, you wanted to have a conference of some sort.

2                    THE COURT:  Right.

3                    MR. RANKIN:  Just to block out what goes on in the

4      future and I didn't --

5                    THE COURT:  Well, not only to block out -- I'm sorry.

6      Not simply to block out.  It will be to determine whether or

7      not on the papers that were submitted that it's necessary to

8      have an evidentiary hearing, evidentiary *Kastigar* hearing.  And

9      that, you know, metaphors are notoriously unhelpful, but to the

10     degree that it might provide some insight about what I'm

11     thinking about, it's in the nature of a summary judgment motion

12     to see whether or not there is presented any genuine issue of

13     material fact on the question of having a *Kastigar* hearing.

14                   So it's not merely to block out.  Maybe that's the

15     second thing that it does.  The first thing is to see whether

16     or not the record supports a *Kastigar* hearing and, depending on

17     that, what next steps we take.  But I'm asking that you kind of

18     be careful and thoughtful about what July and August -- June,

19     July and August might mean for your schedules because this

20     might be part of that schedule.  Does that clarify?  Mr.

21     Rankin?  I'm sorry, Mr. Rankin, are you still on the line?

22                   MR. RANKIN:  I'm sorry, Your Honor.  I had muted it

23     and was just babbling away.

24                   THE COURT:  Well, it's good that you muted it while

25     you were babbling.  Now that you've sorted through your

1    thoughts in an unmuted fashion, does that clarify for you?

2         MR. RANKIN:  Yes, thank you.  So a moment ago I

3    thought you were talking about envisioning a *Kastigar* hearing

4    in June or sometime thereafter, if we're going to have such a

5    hearing scheduled, so that Mr. Reddington would be available to

6    attend or observe to the extent that he wants to.

7         THE COURT:  Right.

8         MR. RANKIN:  That's something different from what you

9    were just referring to as a summary judgment-like hearing

10   following the submission of our --

11        THE COURT:  Yes, it is.  That prospect depends upon a

12   finding that a full *Kastigar* hearing is necessary.  And that

13   comes with this further conference.  I'm trying to use

14   different words because I don't want to implicate terms of art

15   in this area.  Okay?

16        MR. RANKIN:  So are you going to set a date for that?

17        THE COURT:  Not until I see the papers.

18        MR. RANKIN:  Okay, sure.

19        THE COURT:  And then we'll do it at that point.  It

20   will be relatively promptly after receipt of the papers I think

21   because I am more or less refreshed or at least have some

22   understanding of the record as it exists right now.  I don't

23   want to lose that, so I don't want to have it go too far.

24        On the other hand, I want the parties to have an

25   adequate opportunity to present their views on the papers

1    themselves.  So I would think it would be the early part of

2    June that we'd have some sort of conference which would be the

3    predicate for a hearing or not, a full *Kastigar* hearing or not.

4    Okay?

5              MR. HAFER:  Your Honor, this is Mr. Hafer.  May I

6    raise one quick procedural and one substantive issue before we

7    break?

8              THE COURT:  Sure, sure.

9              MR. HAFER:  Just procedurally, I assume, first up,

10   with respect to the indictment, just mechanically sending a

11   Word version of that by email to Ms. Beatty, is that the most

12   helpful to you?

13             THE COURT:  I think so.  You know, I'll try and use

14   kind of markup protocols to send back something to say, Here is

15   something that I think might properly be the form of the

16   indictment that could go to a jury in a joint trial of

17   Ms. Correia and Mr. Andrade.  And then the parties can look at

18   it, and say, Well, we have this problem or we have that

19   problem, that sort of thing.  At least we start the

20   conversation concerning it.  It is also instrumentally helpful

21   to me to be thinking through the differences between the two

22   basic schemes that are alleged in the indictment as it exists

23   now.

24             MR. HAFER:  No problem.

25             THE COURT:  So if you send a Word file to Ms. Beatty

1    that I can fool around with, I'll do that, and we'll do it back

2    and forth as necessary by email rather than putting it on the

3    record because it's not something that is requiring formal

4    action by the court.

5           At some point if there is a joint trial of the two,

6    I'll propose that this be or that something be the form of

7    indictment that goes to the jury because I certainly wouldn't

8    want the jury to have the indictment that includes things that

9    they're not concerned with.

10          MR. HAFER:  Okay.  Do you want to go first, Mr.

11   Rankin?

12          MR. RANKIN:  Go ahead, Zach.

13          MR. HAFER:  Just related, Your Honor, I assume at some

14   point there will be an amended pretrial order backing off the

15   September 14th and, I don't know, perhaps just memorializing

16   the dates we're discussing today, the April 17th for the

17   *Kastigar* submission with respect to Mr. Reddington.

18          THE COURT:  Yes.  I think what I'll ask Ms. Beatty to

19   do is simply do a scheduling order that incorporates all the

20   dates that I've included here and, to the degree that it's

21   necessary, backs off those -- as you say backs off of those

22   filings from the September 14th date.  And in that connection,

23   the working assumption is that that's going to be a joint trial

24   of the two defendants.  I say "working assumption" just so that

25   you understand what your work is if there is not to be

1   severance of the two individuals.  And the only reason for

2   severance of the two individuals that I now see is something

3   that arises under *Kastigar,* and I think the various limits of

4   the decision tree that I've tried to outline give you some idea

5   of where things would go then.  But the core of it is, if this

6   goes as a joint trial, that will be the trial schedule for the

7   joint trial starting September 14th.

8          MR. HAFER:  Okay.  Thank you, Your Honor.

9          Just one issue with substance I just want to flag for

10  Your Honor.  And I want to be very clear that not for a minute

11  in raising this issue do I fault Mr. Reddington in any way,

12  shape or form, but there was an article, a lengthy article in

13  Boston Magazine in the January/February edition related to Mr.

14  Correia.  It was a ten-or-so-page article.  And there were some

15  comments in the article attributed to Mr. Correia that, you

16  know, looking at him through the frame of Local Rule 83.2,

17  again, which I know applies to counsel, were very close to

18  comments that would violate that rule, you know, referring to

19  the government's evidence being put forth by shady informants.

20         The government didn't file a motion or seek anything

21  like that.  But starting in this evening, there's going to be a

22  ten-episode documentary involving Mr. Correia on a new mobile

23  streaming service called Quibi, Q-u-i-b-i.  And the trailer for

24  that documentary or series, which is all I've seen so far,

25  teases comments by Mr. Correia that certainly go directly to

1    saying he's innocent of all the charges and will be proven

2    innocent of all the charges.

3            I just want to flag for Your Honor and for

4    Mr. Reddington that we'll be watching this closely.  I think

5    there's a big difference between, you know, statements of

6    innocence on the courthouse steps the day after charges and

7    what we have here, which is sort of a coordinated publicity

8    effort presumably through some type of PR firm through Boston

9    Magazine and now this documentary.  I'm just letting Your Honor

10   know that, to the extent there are continued comments about the

11   merits of the case, the strength of the government's evidence

12   or that sort of thing, there could be motion practice.

13           I'm not seeking relief at this time.  I just want to

14   flag it in fairness to Mr. Reddington.  I don't think he's done

15   anything wrong at all, but I think it could become an issue.

16           MR. REDDINGTON:  If I may just add very briefly.

17           THE COURT:  Yes.

18           MR. REDDINGTON:  I'll well aware of 83.2.  The Boston

19   Magazine article was I believe investigated, and they started

20   writing it prior to my representing Mr. Correia and then

21   published it during my representation of Mr. Correia, but I had

22   no contact with Boston Magazine at all.  And as far as Quibi is

23   concerned, I have written them.  I forwarded them a letter when

24   I was advised that they intended to release this thing on I

25   think April 15th or whatever the date was.  I sent them a

1    letter and I asked them to please not release it.  I've had no

2    contact with this Quibi or the producers of this thing that's

3    coming out.

4         I did, as I say, I wrote them a letter, and I asked

5    them to please not bring this forward because of the pretrial

6    publicity issue.  I have no, nor does Mr. Correia, have any

7    rights with these people or contracts or ability to prevent

8    them from publishing whatever it is that they're going to

9    publish.  And these interviews obviously took place quite some

10   time ago.  So I just want to make sure that it's very clear

11   that I've had no contact with Boston Magazine or Quibi.

12        MR. HAFER:  And I credit that completely, and I credit

13   Mr. Reddington's statement about the letter.  With respect to

14   Mr. Correia, however, he's touting the document on social media

15   today and other places.  So I just flag the issue for Your

16   Honor.

17        MR. REDDINGTON:  I'll take a look at that.  I wasn't

18   aware there was a posting today.

19        THE COURT:  From my perspective, this is Judge

20   Woodlock, I of course will solute any flag, but I think I must

21   say, number one -- I'm sorry.  I think someone is trying in

22   realtime to observe whatever it is that Quibi has to offer,

23   which you might mute that.

24        MR. REDDINGTON:  It's probably Dave Tobin.

25        THE COURT:  Okay.  Certainly in identifying the usual

1    suspects, I share that investigative hypothesis.  But in any

2    event, whoever it is should mute it.

3         Let me say a couple of other things.  I welcome the

4    sensitivity of both the United States Attorney's Office and

5    Mr. Reddington to these issues.  They're real issues, more

6    broadly than just this case.  They are something that I will

7    take seriously and will consider making an order under Rule

8    83.2.2, a special order if I find that a party has been

9    soliciting or otherwise flogging extrajudicial commentary that

10   is potentially detrimental to the selection of an untainted

11   jury who will resolve the case.

12        Based on what I've been told so far, I was not

13   familiar with the Boston Magazine article.  I'd like a copy of

14   it to be filed by the government.  Similarly, to the degree

15   that I'm not sure I know the precise name, Quibi or Quibi,

16   publishes or broadcasts something, I'd like to have a copy of

17   that filed as well.

18        To the degree that, Mr. Reddington, you've reached out

19   to either of those entities through a letter or some document,

20   I'd like a copy of that document.  I treat this very seriously,

21   and at some point I think we'll deal with it sua sponte.

22        The Local Rule 83.2.1 has I think been viewed by most

23   members of the court as being self-executing.  Self-executing

24   if one of the parties raises the concern that one of the other

25   parties has engaged in a violation.  But there's also a

1    strategic dimension to that kind of adversarial triggering of

2    treatment of 83.2.1, and that is that it may be agreeable to

3    both parties to engage in violations of 83.2.1 and consequently

4    to at least get one opportunity before the court shuts it down

5    of fighting fire with fire.  I don't view it that way.  I don't

6    think neither the parties or their attorneys should be starting

7    fires and certainly should not be extending pyrotechnic

8    activity.

9         So as I started this, I do of course solute the flags

10   that have been raised by Mr. Hafer and responded to by

11   Mr. Reddington.  I want a full documentary record of the

12   matters that they have referred to, and I am going to direct

13   that you file as promptly as you can those materials so that

14   they are on record.  And the parties should be forewarned that

15   at this stage my view is that a violation of 83.2.1 is

16   something that I may raise irrespective of whether one of the

17   parties does and that I will consider a special order under

18   83.2.2 for assuring that there are no extrajudicial statements

19   by the parties or witnesses that are likely to interfere with

20   the rights of the accused or with the litigants to a fair trial

21   by an impartial jury.

22        So I'll leave that at that, but I don't want

23   anybody -- I don't think anybody does -- to be left with the

24   idea that we're now in the don't ask don't tell stage of

25   dealing with pretrial publicity.  It's on the front burner.

1    And without in any way suggesting improprieties by any of

2    counsel here, there have been enough recent testings of the --

3            (Interruption.)

4            THE COURT:  Is that Mr. Tobin again playing the piano?

5            There have been enough recent testings of what the

6    limits of pretrial commentary are or at least what people can

7    get away with that perhaps some definitive action by the court

8    to make clear what happens when you violate it so that there's

9    an effective specific and general deterrent to that kind of

10   misconduct.  Further the affiant sayeth not.

11           Is there anything else that we need to take up?

12           MR. RANKIN:  Your Honor.

13           THE COURT:  Yes.

14           MR. RANKIN:  That is Charlie Rankin.

15           THE COURT:  Go ahead, Mr. Rankin.

16           MR. RANKIN:  One issue I just wanted to ask about,

17   putting the indictment in shape, if there's a need to, Your

18   Honor contemplates getting a Word document and circulating an

19   edited version of the indictment to account for the possibility

20   that the two defendants will be tried together just on the

21   corruption counts.

22           THE COURT:  Right.

23           MR. RANKIN:  Does Your Honor anticipate doing anything

24   more than just renumbering the --

25           THE COURT:  No, there's not really much.  Although

1    there would be some renumbering.  You know, as I go through it

2    quickly, I didn't see anything that really needed to be

3    restated.  It might be that the headings between some of the

4    numberings might change.

5         So I don't know if you have it in front of you, but

6    I'll use as an example Page 19 above paragraph 64, it says,

7    "Overview of Correia's and Andrade's corruption."  That seems

8    to me not disinterested as a heading, and I probably would

9    change that to something of, "Overview of defendants'

10   activity," just to break it out that way.

11        Now, that's a kind of rewriting of it.  I might move

12   paragraph 2, which is an identification of Mr. Correia that

13   might benefit from his full name and stating that he was the

14   mayor of Fall River.  That's a change, and that would then lead

15   to paragraph 66, which would be renumbered to include

16   Ms. Andrade's first name, Genoveva Andrade -- I apologize in

17   advance for mispronouncing people's names, but that's the

18   thrust of it.  But it would be those kinds of modest

19   modifications.  I don't think that they're the kinds of things

20   that would go to a question of a variance in the -- there's no

21   intention to -- that would go to a variance in the indictment

22   as returned by the jury.

23        But one of the reasons to circulate it that way rather

24   than the night before the case goes to the jury is to catch any

25   problems and see if they can be mitigated or dealt with in some

1    other fashion.  Did that answer that question?

2              MR. RANKIN:  Yes, Your Honor.  I was just -- when you

3    used the word earlier, you earlier you used the word

4    "reorganize," and that concerned me.  Obviously the court's

5    not -- the court's role is not to edit the indictment to clean

6    it up or make it more --

7              THE COURT:  No, I'm not, I'm not going to be rewriting

8    it or dusting off my skills at providing a charging document.

9    But really probably starting -- I mean, you'll see what I do,

10   and you can respond to it.  But probably starting at paragraph

11   57, that's where the revised version for purposes of

12   presentation to the jury would start, and 57 would become

13   paragraph 1, that kind of thing.

14             But I haven't -- I've looked at it a bit because I

15   wanted to be sure I understood the theories involved so that I

16   could proceed to an evaluation of the motion to sever in

17   particular.  And I think a useful exercise for me, not that I'm

18   looking for some more work of something that may not eventuate

19   is to circulate that so we can continue the conversation or

20   maybe initiate it.

21             Okay.  So anything else from any of the other parties?

22             MR. REDDINGTON:  Not from Reddington.  Thank you.

23             MR. HAFER:  No, Your Honor, not from the government.

24             MR. RANKIN:  No, Your Honor, not from Ms. Andrade.

25             THE COURT:  Okay.  So we've got a schedule and an

1   outline of what our activities are going to be in the next

2   several months, and we'll act on that -- act on those.  I think

3   the next time that we'll be formally back together, unless

4   something remarkable happens, is after I receive the parties'

5   final submissions in connection with written record on the

6   motion to sever, and then we'll have a conference to discuss

7   the implications of that.  So I'll schedule that after I've

8   seen the materials that the parties have submitted.

9          With that then, we'll be in recess in this matter.

10  Thank you.

11          (Adjourned, 10:10 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 21st day of  June, 2020.

10

11                   /s/ Kelly Mortellite

12                   _____

13                   Kelly Mortellite, RMR, CRR

14                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25