UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                               )
UNITED STATES OF AMERICA,       )
                               )          Criminal Action
          Plaintiff,            )          No. 18-10364-DPW
                               )
v.                              )
                               )
GENOVEVA ANDRADE,               )
                               )
          Defendant.            )
                               )
```

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


SENTENCING

June 10, 2021


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      Zachary R. Hafer
 3    David G. Tobin
      United States Attorney's Office MA
 4    1 Courthouse Way
      Suite 9200
 5    Boston, MA 02210
      617-748-3106
 6    zachary.hafer@usdoj.gov
      david.tobin@usdoj.gov
 7
      On Behalf of the Defendant, Genoveva Andrade:
 8    Charles W. Rankin
      Rankin & Sultan
 9    151 Merrimac Street
      Second Floor
10    Boston, MA 02114-4717
      617-720-0011
11    crankin@rankin-sultan.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1   
2            (The following proceedings were held in open court

3   before the Honorable Douglas P. Woodlock, United States

4   District Judge, United States District Court, District of

5   Massachusetts, at the John J. Moakley United States Courthouse,

6   One Courthouse Way, Courtroom 1, Boston, Massachusetts, on

7   June 10, 2021.)

8   (Case called to order.)

9            THE COURT:  Well, we've set up the courtroom, as you

10   can see, a little bit differently than we had at trial, and

11   that's in part because of developments generally.  And I'm of

12   the view now, the court is of the view as well with our

13   epidemiologists, that we can have the courtroom open for as

14   many as 30 people in here.  And so Ms. Beatty has been tracking

15   that as well.

16            The position I'm taking at this point is that everyone

17   in here has been vaccinated, and so we don't have to concern

18   ourselves with that issue.  And I think there may be one or two

19   other people who may be coming into the courtroom at a later

20   point.  But the court security officer and Ms. Beatty

21   understand the rules of the game that I've set up here.  There

22   have been other supervening events as well.

23            But let me go through the materials that I have.  I

24   have the Presentence Report as of -- an addendum dated June 3.

25   I have ordered or directed that there be docketed an email that

1    was received yesterday evening from Holly McNamara who wanted

2    to offer her views with respect to sentencing.  And whenever

3    views like that are offered and they are presented to me, I

4    docket them, so those were included.  I have the defendant's

5    sentencing memorandum dated June 8, and I have a number of

6    letters attached as exhibits to that.  I have the government's

7    sentencing memorandum as well as of June 8.

8              Do I have all the materials, written materials?

9              MR. HAFER:  That I'm aware of, yes, Your Honor.

10             MR. RANKIN:  I believe so, Your Honor.

11             THE COURT:  So let me also raise two additional

12    matters.  The scheduling order in this case for sentencing

13    called for any memorandum to be submitted not more than seven

14    days before the sentencing hearing unless I set another time.

15    I did.  This was scheduled for some time, although it was

16    extended when I allowed the parties' joint motion to continue

17    sentencing on February 25.

18             I did not receive the memorandum seven days ahead of

19    time.  As a matter of fact, I had to direct Ms. Beatty to

20    inquire of counsel where the memorandum was.  Why did it take

21    so long, Mr. Hafer?

22             MR. HAFER:  Your Honor, as I noted to Ms. Beatty,

23    initially Mr. Tobin and I had discussed it, and I don't file a

24    sentencing memorandum in every case.

25             THE COURT:  Do you read orders in every case?

1          MR. HAFER:  I read the orders, yes, Your Honor.

2          THE COURT:  And there was an order that says that

3     there is to be a memorandum filed or any memorandum filed, and

4     of course you're seeking to have a C plea accepted.

5          MR. HAFER:  Right.  So eventually we filed one, Your

6     Honor, but again, I don't file one in every case, and I had

7     taken the view here that, given the terms of the agreement, it

8     wasn't necessary.  I interpreted your reminder as saying that a

9     memo would be helpful, and we filed one.  But that's on me.

10          THE COURT:  You understand that it's the obligation of

11     the parties to convince me that I should accept a C plea?

12          MR. HAFER:  Yes, Your Honor, I do.

13          THE COURT:  And so we'll explore that a bit more.  Mr.

14     Rankin, why was --

15          MR. RANKIN:  Your Honor, I apologize for not being

16     timely with my memorandum.  I had intended to file one and did

17     file one.  The process of accumulating the letters was somewhat

18     involved, and putting them in a fashion that would be

19     understandable to the court took me more time than I thought,

20     and I neglected to file it in a timely fashion.

21          THE COURT:  All right.  Well, there is a reason why

22     these are asked for ahead of time, which is, I read them very

23     carefully, and I've read these of course very carefully.  And

24     assimilating the information is important I think for these

25     purposes.

1              And I emphasize, and I've emphasized on a number of

2    occasions that I'm not necessarily someone who thinks that C

3    pleas are the proper way to dispose of cases.  They reflect a

4    view that the parties don't trust the court, that there's a

5    fear of judging involved from my perspective.  And I would

6    think that the parties would be interested in supporting their

7    positions in a timely fashion so that they could be thought

8    through, which brings me to the next point, and this is

9    directed at the government now.

10             We've had a trial in which the same counts have

11   resulted in not guilty verdicts.  The question I guess I have

12   is what is the position of the government going to be with

13   respect to the defendant Correia as to relevant conduct for

14   those acquitted -- or not acquitted but not guilty counts?

15             MR. HAFER:  I think they're relevant conduct, Your

16   Honor, but there's no doubt that they're acquittals, and I

17   don't think they should go into the guidelines calculation for

18   Mr. Correia.

19             THE COURT:  They may not go into the guidelines

20   calculations, but are you going to be arguing them for purposes

21   of my making a determination about the proper sentence in this

22   case?

23             MR. HAFER:  We're going to focus -- we'll be focusing

24   on the convicted counts, Your Honor, for sure.

25             THE COURT:  Okay.  So what I have then is, with

1   respect to Mr. Correia, the counts are, from the government's

2   perspective I guess, to be ignored; and in the case of the

3   defendant here who pled guilty, they are the basis of the

4   conviction.

5          MR. HAFER:  I wouldn't say "ignored" is the right

6   word, Your Honor.  I think that the reality is the jury

7   found --

8          THE COURT:  I know what the jury found.  The question

9   is what is it that the government is going to be asking me to

10  do.

11         MR. HAFER:  Sentence on the basis of the counts for

12  which he was convicted.

13         THE COURT:  Okay.  So let me put it in a broader

14  sense.  The whole purpose of guideline sentencing is lack of

15  unwarranted disparity.  We have one defendant who has been

16  found not guilty as to whom the government says I'm not going

17  to be -- or you will not ask me to consider the circumstances,

18  another defendant on the flip side who has been convicted

19  because -- or at least has tendered a plea, I should say, that

20  indicates acceptance of her criminal responsibility, subject

21  obviously to a C plea.

22         Now, why wouldn't that be a matter of disparity that I

23  would want to consider?

24         MR. HAFER:  Well, I don't think it's disparity if one

25  defendant chooses to plead to something having been --

1          THE COURT:  We're talking about sentencing, and we're

2    talking about relevant conduct, and it is a disparity if

3    similarly situated defendants --

4          MR. HAFER:  They're not similarly situated.  One went

5    to trial and one pled guilty.

6          THE COURT:  Okay.  I understand the position.  Now

7    you'll understand my position about concern.

8          MR. HAFER:  I do.  And let me say, I don't want to be

9    glib about the overarching thing.  When we fashion a sentencing

10   recommendation to Your Honor and there are now I think four

11   defendants before Your Honor in this case, the thrust of our

12   internal deliberation and consideration is are we being fair

13   and consistent in terms of what we're recommending for all of

14   the defendants.

15         THE COURT:  One would have thought that that would

16   express itself in a timely memorandum.  Because of course your

17   memorandum doesn't express itself in those terms.  It is

18   conclusory with respect to the government's position.  So I'm

19   pleased to know that the government considers these matters.

20   Of course I wouldn't know that because it's not in the

21   memorandum.  I have to ask the question because there's a

22   delayed memorandum.

23         So I think you may understand at this point that I am

24   quite concerned about this, and this comes against a backdrop

25   in which I have not kept track but on quite a number of cases

1    I've rejected C pleas.  So I think we have the range of issues

2    before you.  I'll hear you, Mr. Hafer, about the government's

3    recommendation.

4            MR. HAFER:  Yes, Your Honor.  As I noted in the memo

5    and I repeat now, this is a recommendation that we did not

6    arrive at lightly, that was the subject of extensive internal

7    deliberation and extensive negotiation with very experienced

8    defense counsel, Mr. Rankin.

9            We considered several things.  First, the conduct

10   itself, but also the fact that the government had made a

11   decision very early in this portion of the investigation to

12   seek statutory immunity for Ms. Andrade.  We considered the

13   fact that the government had immunized the marijuana vendors in

14   this case who had paid a bribe.  We considered the 3553 factors

15   with respect to Ms. Andrade specifically, specific deterrence

16   and general deterrence.  We considered the once-in-a-century

17   pandemic and the likelihood --

18           THE COURT:  What's the relevance of the

19   once-in-a-lifetime pandemic?

20           MR. HAFER:  I think, Your Honor, as we saw with all

21   the compassionate release litigation, as we learned from

22   several colleagues --

23           THE COURT:  So let me then put this in a different

24   context.  I'll start talking about federal program bribery as a

25   monetization of what fraud consists of, like the Varsity Blues

1    cases.  They seem to have the same kinds of concerns here,

2    concerns of someone who has a belief that family trumps legal

3    obligation.

4         They arise in the context of the pandemic.  There have

5    been a series of sentences that the courts have imposed, that

6    various judges of this court have imposed, rejecting a view

7    that the government has taken about how you calculate the

8    guidelines under these circumstances.  And we're faced with

9    this problem of one side of the transaction being, if not

10   disregarded, if not considered for purposes of supervised

11   release, nevertheless the government's position is that I

12   should not look at it for purposes of relevant conduct or at

13   least that it doesn't in any way justify departing, I suppose,

14   from the C plea.

15        Now, I've heard the further explanation here.  I'm not

16   finding it compelling.  So perhaps you'll have a broader focus

17   on this in light of the office's careful consideration of

18   things, like the Varsity Blues cases.

19        MR. HAFER:  I'm not understanding what -- are you

20   suggesting there's an inconsistency in the position we've taken

21   in the Varsity Blues cases?

22        THE COURT:  Yes, absolutely.  I'm suggesting precisely

23   that.  In terms of --

24        MR. HAFER:  The --

25        THE COURT:  Just a moment -- in terms of the treatment

1    of this kind of offense, cognate offense, with a defense that

2    has to do with considerations of family.  And "family" of

3    course is a major code word here.

4         There is of course in addition the question of

5    statutory immunity which you've raised, and you will recall

6    that I asked whether or not the government was prepared to

7    immunize and move forward with immunity as to this defendant at

8    trial, and the government said no, you didn't want to do that.

9         So I'm not sure why, I'm not sure that the government

10   has to tell me why they don't do that.  Although it is

11   something under these circumstances that I'm going to be taking

12   very seriously in deciding whether or not to accept a C plea on

13   these premises.

14        I don't believe that I've been told or presented with

15   a balanced view about this issue.  It seems to me to be

16   something of a one-off, and I'm not exactly sure I understand

17   why it's being treated in that fashion.  So you've got the

18   sense of what my concerns are, and you can address them.

19        MR. HAFER:  Well, let me say, one, with respect to

20   Varsity Blues, one immediate -- and you just alluded to it.

21   One immediate distinction is I'm not aware that any of the

22   defendants for whom we sought incarceratory sentences had ever

23   been immunized.

24        I was still going through my list of considerations

25   here and how we arrived at this, but it was very much

1    consideration for the government in addition obviously to the

2    3553 factors, the importance -- and Your Honor noted this

3    yourself on several occasions, the importance of getting the

4    Correia matter to trial.  And I think that does position this

5    very differently.

6         It was clear and the reason the pandemic is relevant,

7    and we saw this day in and day out at the trial with the number

8    of people that could be in the courtroom and the different

9    considerations, it was clear to the government that we wanted

10   to get the Correia matter to trial.

11        THE COURT:  So did I, and I set it for trial, set

12   these two for trial, and I severed the case to permit that so

13   we didn't have spillover in the SnoOwl allegations with respect

14   to Ms. Andrade.  So I don't find that to be compelling.

15        MR. HAFER:  Your Honor, it was our calculation that

16   the odds of a two-defendant trial getting off the ground, given

17   all the restrictions we were dealing with, and I don't think we

18   had room for anybody.  We do assess things like -- and I know

19   you went back and forth with Mr. Reddington extensively.  He

20   raised the issue of Mr. Correia needing to have family members

21   in court.

22        THE COURT:  When was the C plea entered into?

23        MR. HAFER:  December of 2020 I believe.

24        THE COURT:  And when was the discussion of how the

25   court was going to be set up?

1          MR. HAFER:  It was much later than that, Your Honor.

2          THE COURT:  Okay.  So the issue was not raised with me

3     about --

4          MR. HAFER:  You're asking how we made the decision.

5          THE COURT:  Yes, I am asking about how you made the

6     decision.  We were still moving forward on the question of a

7     joint trial at that time and how it was going to be undertaken,

8     and steps have been taken, and this is a unilateral

9     determination by the government.

10          MR. HAFER:  It's not unilateral.  It's exclusively

11     within our province to determine what we believe the proper

12     recommendation from the government is on a sentence, and we're

13     certainly entitled to determine what we think the likelihood of

14     a case is --

15          THE COURT:  You certainly are.  You make the

16     determination.  But you don't get a judgment for that.  You

17     don't get a signature from a federal judge simply because you

18     made some internal determinations that --

19          MR. HAFER:  I'm not suggesting that.  I know that,

20     Your Honor.

21          THE COURT:  Okay.  So it was unilateral, and you say

22     it is your choice to do whatever you want.

23          MR. HAFER:  "Unilateral" implies some sort of

24     pejorative --

25          THE COURT:  No, it doesn't.  It suggests that one

1    party to the litigation made the choice, made the choice to

2    agree and made the choice to anticipate perhaps what the court

3    might do without engaging the court in a discussion about can

4    we really do this, and if so, when can we do this.

5            MR. HAFER:  Can I add some facts to that?

6            THE COURT:  You'll have an opportunity to add these

7    facts, but I want to be absolutely clear what it is that you're

8    saying.  And what it is that you're saying is you have the

9    right to do what you want as a party.  And that's absolutely

10   the case.  You have the right to make judgments about

11   prosecution and who to prosecute under what circumstances, but

12   you do not have the right to force a court to impose a judgment

13   simply because you've made the judgment that a case can be

14   pursued in a particular way.

15           And so, in order to satisfy the court, you have to

16   have -- I think anyway -- a compelling reason, other than, "We

17   did it and we know best."  So I'm trying to be as clear as

18   possible that, in order to justify this agreement, there's

19   going to have to be something more than reliance upon the

20   prerogatives of prosecution to make prosecutorial decisions and

21   that a number of the ones that you've raised so far, and of

22   course you'll undoubtedly provide me with more information than

23   you did in the memorandum, belated memorandum, you'll provide

24   me with more information about this, but the ones that you've

25   provided so far seem to me to be pretextual.  So, go ahead.

1          MR. HAFER:  They're not pretextual.  I don't even
2    understand what you're suggesting here, like the government had
3    some --
4          THE COURT:  I want to get to the bottom of this, and
5    the bottom of it is --
6          MR. HAFER:  We thought --
7          THE COURT:  Just a moment.  Why did you do it?
8          MR. HAFER:  Because we thought it was the right result
9    in the case --
10          THE COURT:  That's conclusory.
11          MR. HAFER:  -- in the interest of justice -- you
12    haven't let me finish.
13          THE COURT:  I'm telling you what the problem is with
14    this.  It is conclusory, and continued reinforced statements
15    like that are not helpful.
16          Now, I will not prompt you any further.  You'll tell
17    me everything you think I should know.  You know what is a
18    matter of concern to me, and you can say whatever you want.
19    And if that's what you're going to rely on, that's what I will
20    consider.  So, go ahead.
21          MR. HAFER:  The first instance, Your Honor, we
22    consider the offense itself.  These are serious offenses.  It's
23    not just program bribery.  The most serious offense in our view
24    is the extortion of Mr. Saliby, marijuana vendor number 4.
25          So we start there with the seriousness of the offense.

1    We absolutely consider the fact that we had previously

2    immunized Ms. Andrade.  We considered trial risk.  Okay.  To

3    your point about the acquitted conduct, the jury did acquit on

4    three of these counts.  So litigation risk is a part of the

5    assessment.  Consistency across the case.  I referred to the

6    marijuana vendors and the fact that they had been immunized.

7    Okay.  So we have individuals who have paid bribes, in some

8    cases big bribes, and the government has made a decision that,

9    in the larger issue of public interest, that immunity is

10   justified for them because you're trying to get to the

11   principal or the most culpable person.

12          So we considered is it reasonable to come in and ask

13   for significant incarceration on Ms. Andrade, who did not

14   profit, who did not pay a bribe to someone in order to get

15   something of value, is it reasonable to come in and ask for

16   jail on Ms. Andrade when we've immunized these individuals and

17   also when we previously immunized Ms. Andrade.

18          Now, she didn't tell the truth, but it seemed to us

19   discordant to say statutory immunity is the right result for

20   this person and then come in and ask for a period of

21   significant incarceration.

22          We did consider the likelihood of the trial going off

23   with two defendants.  Your Honor, you know I've said on the

24   record on behalf of my office that the government is beyond

25   appreciative for the efforts this court took, the court staff

1    took to get the case to trial.  We believe those efforts were

2    herculean, in good faith.  But the reality was, as we thought

3    about the -- knowing the social distancing requirements at the

4    time, knowing the arguments that the defendant -- and Mr.

5    Rankin, as you know, filed a very detailed fact-specific

6    challenge to conducting a trial in the middle of a pandemic.

7         So there wasn't only in our view litigation risk with

8    respect to these individual counts.  There was, are we going to

9    prevail now in light of these very fact-specific issues of

10   first impression being raised by Mr. Rankin.  And so how does

11   that bake in, how does that bake into the equation?

12        So we absolutely considered Mr. Rankin's motion with

13   respect to the coronavirus issues and conducting a trial, most,

14   if not all of which were issues of first impression.  We

15   considered the risk.  Like I said, we considered the risk of

16   the individual counts, and ultimately, we thought about things

17   like deterrence.

18        And as Mr. Rankin referred, this is a very public

19   case, and there's been a lot of press.  And we considered the

20   fact that Ms. Andrade has been humiliated, has faced a lot of

21   public scrutiny for her actions, and we did consider the fact

22   that it was important to try the Correia matter.  He was the

23   elected official.  He was the ring leader here in our view.  He

24   was who profited.  He was the one with a higher duty of public

25   trust.

1          So in light of all those things -- and it wasn't a

2     close call.  It was not a close call.  It was a hard, hard

3     decision for us.  And ultimately --

4          THE COURT:  I'm sorry, "It wasn't a close call.  It

5     was a hard decision"?

6          MR. HAFER:  I'm sorry.  It was a close call.  This was

7     not an easy call.  I misspoke.  This was one that we talked

8     about extensively.  Mr. Rankin and I had a lot of

9     conversations, and this is where we ended up.

10          And I'll say on the C plea, Your Honor, I understand

11     the court's view.  I know you've made that very clear over the

12     years.  Mr. Rankin is probably better positioned than I am to

13     speak to that.  I know you know that in these types of matters,

14     from a client relations' perspective, there's an element of

15     certainty that is important.  But the government knows, the

16     government knows your views here.  And the reality is this is

17     what it took to reach the resolution we reached.

18          And so for all of those reasons, looking at each of

19     the factors under 3553, the fact that we don't think

20     Ms. Andrade is any type of risk to re-offend at all, that we

21     think that the message has gone out to the public with the

22     amount of press and the high profile prosecution of

23     Mr. Correia, considering all of the other defendants in the

24     case, the immunized vendors, we believe time served plus 12

25     months of supervised release, a fine of $10,000 and the $600

1  special assessment is sufficient but not greater than necessary

2  under 3553.

3          But yes, we talked about it extensively.  We

4  considered the other defendants.  It was a close call, but we

5  believe it's the right call, and we believe that the court

6  should accept the C plea.

7          THE COURT:  Do you think that there's any loss to the

8  City of Fall River from the defendant's activity here?  She was

9  paid a certain amount of money.  In the Varsity Blues cases,

10 that's frequently, and certainly by me, being considered as a

11 basis for restitution or fine.  That is a financial cost to the

12 defendant.  She received money that was illegally tendered to

13 her.  As part of a relationship with someone else, I understand

14 that.  But I'm not sure I understand how that's not part of

15 the --

16         MR. HAFER:  I understand your point.  We arrived at a

17 fine number after extensive negotiation of $10,000.  Her salary

18 was much higher than that.  There's no doubt about that.  I

19 think it was 78 or 79,000.

20         THE COURT:  And whatever money she received.  She

21 actually received money.  She kicked back money, but she

22 received money.

23         MR. HAFER:  You're referring to her salary?

24         THE COURT:  Yes, I am.  Part of which is, according to

25 the evidence in this case, and of course it's a matter that

1    under other circumstances would be litigated, but she got a

2    job.  She received money for that job.  She didn't receive as

3    much money as had been allocated for that job, but it was money

4    she received for which the City of Fall River is presumably a

5    victim under these circumstances, entitled either to

6    restitution or, if restitution seems not appropriate under

7    those circumstances, something that I would consider for

8    purposes of a fine, at least at the level of what was taken

9    from the City of Fall River.

10           MR. HAFER:  I'll just tell you that we arrived at

11   10,000, Mr. Rankin and I.  And I understand your point.

12           The reality is Ms. Andrade did a lot of legitimate

13   work for the City of Fall River, a lot, and gave Mr. Correia

14   $22,800 of the 78, 79 number, I don't remember the exact number

15   of her salary.  So figuring out a number that was illegitimate

16   versus legitimate is very difficult.

17           I've read the letters.  You've read the letters.  I

18   feel like I'm now morphing into Mr. Rankin, but she was

19   involved in a lot of different things on behalf of the city and

20   did a lot of legitimate work.

21           THE COURT:  So I look back and make the correlation

22   because 666 has taken on a new life in the arsenal of the

23   United States Attorney's Office, in part, I think as a result

24   of pushback that the Probation Office has made about

25   calculations in bribery extortion circumstances that are

1    difficult to quantify.

2            But I look at the same kinds of letters that I receive

3    in Varsity Blues cases.  There is no question, all of us would

4    agree that these are incredibly moving letters about someone

5    who has given her life to important undertakings.  I don't

6    disagree with that at all.

7            But that's not why people come before me, because

8    they've had good lives.  They come before me because there is a

9    credible allegation, and in this case an agreement, that a

10   federal crime was committed, and the question is calibration of

11   that under these circumstances.

12           So I think you have an understanding of my view with

13   respect to that.  I understand your view with respect to that.

14   And I'm not sure that further characterizations one way or the

15   other will be helpful or fully understood by you or others.

16   But this is your opportunity to justify it.  And if that's the

17   justification, I understand your justification.

18           MR. HAFER:  That's it, Your Honor.

19           THE COURT:  Okay.  Mr. Rankin.

20           MR. RANKIN:  Your Honor, I think the sequence of

21   events that led to the plea agreement is important to remind

22   the court.  I don't have the exact dates of each event, but I

23   know that we had a series of hearings in the fall leading into

24   December in which we were discussing a joint trial with two

25   defendants just on the -- not on the SnoOwl but on the other

1    cases.  And the court talked about the limits on the number of

2    people in the courtroom that had been adopted as a result of

3    the Tufts epidemiologists and their work.  And as I recall, the

4    number was 24.  And if you counted up the number of people

5    involved in trying the case with two defendants, there would

6    not be room for the public.  And I recall filing I think an

7    extensive memo on that issue.  And so that had been discussed

8    with the parties and the court prior to the plea agreement

9    being reached.

10           THE COURT:  Just so we're more clear about that, it

11   wasn't merely that.  This is anticipatory, but there was no

12   reason why necessarily under those circumstances and those

13   limitations it had to be tried during pandemic times.

14           One could say, "All right, this will be tried when we

15   get back to something closer to normal."  But we hadn't even

16   reached that point.  We were working our way through that

17   point.  And I, in response to various initiatives of the

18   parties said, "Okay, we'll do this as simply a City of Fall

19   River governance case rather than including SnoOwl," and in

20   part because a joint trial I thought would be problematic for

21   Ms. Andrade, that she would be exposed to spillover.  But there

22   was no reason we had to go at that time, except to get a prompt

23   resolution of the case, but it was never presented to me in

24   that fashion.  So, you know, I have clearly in mind, because

25   I've gone back and looked at it, the sequence of events, and

1  this is anticipatory on the part of the parties.

2       No question that a powerful advocacy was made on

3  behalf of Ms. Andrade, and issues of trial risk or litigation

4  risk were open to both parties, and that's why people seek

5  certainty.  On the other hand, I'm not sure that I think that

6  that's particularly important if what is reached is an

7  agreement that is not reasonable.  And my view is, if it's

8  trial-worthy, it's trial-worthy; we'll have a trial.  We'll

9  have a trial according to the usual mechanisms for trial.  If

10  it's not going to be done in a pandemic, it's going to be done

11  at some other point.

12       But the parties have incentives.  That's what plea

13  bargaining is all about.  They have incentives to try to

14  minimize their risk in various sorts of ways, including cutting

15  the court out of having any role other than signing off, and

16  that's what the C plea is.  But your rendition of the order of

17  this does not suggest to me that -- not merely doesn't suggest

18  to me -- is inconsistent with my view of the development of the

19  way in which we're going to try this case.

20       And I certainly had not reached the point of saying

21  it's impossible for us to try this as a joint trial.  It was

22  something we were going to work through and I should say other

23  sessions of this court were working through in other kinds of

24  cases.  So yes, challenges provided by the pandemic but not

25  ones that, from the court's perspective, are ones that trump

1    everything else.

2            MR. RANKIN:  Well, I think the court began by

3    inquiring as to the justifications for this and an explanation

4    for how we wound up here.

5            THE COURT:  I keep interrupting, but I just want to be

6    sure that people focus on what's important in this analysis,

7    which is different from the analysis of what the actual

8    sentence should be.  But in this analysis, the focus, as far as

9    I'm concerned, is to provide a justification for the sentence

10   that's imposed here and not an explanation for the bargaining

11   positions that the parties were taking.

12           MR. RANKIN:  Well, if I may just explain a couple of

13   things.

14           THE COURT:  Right.

15           MR. RANKIN:  I don't know if it's directly responsive

16   to the court's question, but I'll do my best.

17           THE COURT:  Right.

18           MR. RANKIN:  So my impression from the fall was that

19   the court and the government were very determined to put the

20   mayor on trial as quickly as possible, and the co-defendant was

21   not objecting.  I was objecting.  I think Your Honor will

22   recall that I filed motions to continue, was not happy about

23   having to try it in pandemic-like conditions.

24           So certainly my impression, whether the court had

25   formally issued a trial order or not, and I understand we were

1    working our way through a series of issues, we had various

2    trial dates that got continued, but it was clear in my mind

3    that this case was going to trial during the pandemic, and I

4    think that it was clear in the government's mind as well.

5           Whether or not the court had issued an order saying,

6    "Okay, you know, these are the conditions in the courtroom,

7    this is how it's going to be," everyone's impression was -- or

8    I think, I can't speak for the government -- that this case is

9    going to trial.  It's going to trial during the pandemic.  It's

10   going to trial as two defendants.  And I think that's what

11   prompted the plea agreement.

12          The other thing that I think Mr. Hafer said that is a

13   reality is that there was litigation risk here obviously for

14   the defendant, she could be convicted, but also for the

15   government.  I mean, she's pled guilty.  She's acknowledged

16   that she did these things.  But looking -- I didn't watch the

17   trial.  I haven't read the transcript.  But I understand that

18   the allegations as to Costa were not accepted by the jury in

19   its verdict, that the allegations with respect to the bribery

20   were not accepted by the jury.

21          Just in talking with participants about the trial,

22   some people told me that Mr. Saliby was a persuasive witness,

23   you know, the colorful language in the government's sentencing

24   memo about Ms. Andrade being consiglieri to the old school

25   Tammany Hall kind of thing I think was a little overblown.

1        Interestingly enough, in discovery it was revealed

2   that Mr. Saliby had prepared notes very shortly after the

3   meeting with the mayor and Ms. Andrade.  And of course the

4   thing that the government focuses on is that she said, "You're

5   now family," after understanding that the mayor and Mr. Saliby

6   had come to a meeting of the minds.  That's nowhere in his

7   notes.

8        Now, I understand there could be explanations for it,

9   and I don't know if that was in the government's mind, but

10  there's litigation risks for both sides.  And I think that's an

11  important factor.

12       Another question the court raised was, is the $10,000

13  fine adequate to compensate the City of Fall River, and

14  shouldn't she be required to forfeit or be fined the amount

15  that she got perhaps net of the 22,000 that she gave to the

16  mayor.  And the court referred to the Varsity Blues case.  I

17  would refer to all of the police overtime cases that have come

18  through in the last couple of years where people have, as I

19  understand it, been required to repay the amount of fake

20  overtime where they didn't actually work, but they haven't been

21  required to give up their salary for the year where they were

22  actually riding the Turnpike or working in the evidence room.

23       THE COURT:  I think those are valid comparisons and

24  not ones that speak well to the consistency of sentencing by

25  the court and recommendations by the government in connection

1   with those kinds of cases.  That is to say they're not I think

2   supportive of the larger purpose of, is this sentence

3   reasonable.

4        But, you know, one of the things I wanted to be sure I

5   hadn't missed here is the plea colloquy.  Now, of course I made

6   a determination that it was knowing and voluntary, but my

7   recollection -- and I should have actually tabbed this because

8   I was looking at it -- is that there was an agreement that the

9   reference to "family" was made.

10        MR. RANKIN:  I'm sorry?

11        THE COURT:  A reference to "family" was made.

12        MR. RANKIN:  Yes, yeah, I'm not disputing that, Your

13   Honor.  She pled guilty, and she acknowledged the statement of

14   facts.  If it was a trial, you know, I can cross-examine

15   Mr. Saliby --

16        THE COURT:  Absolutely, and that comes back to this

17   larger issue, which is, for the court, presented with

18   circumstances like this, the overarching view from my

19   perspective is to be sure that there is a process that is

20   followed that gets a just judgment.  And if it means going to

21   trial, it means going to trial.  If it means that what the

22   defendant said in her colloquy is something that cannot be used

23   against her, of course it can be used against her, unless she

24   says something contrary to it at trial, testifies at trial.

25        So what we're saying is she didn't get a trial, and

1   she could have challenged these issues, and I think that's

2   right.  And so, you know, I'm being asked to put my signature

3   of approval on a sentence that I've raised some concerns about.

4   And frankly, your references to the overtime cases, both state

5   and City of Boston, are ones that I think are quite forceful,

6   important but not quite the same way I think you do, which is

7   to say that she should get the benefit of the same kind of

8   failure of the courts and the prosecution to think carefully

9   about what that really means for the police officers.  But I

10   think you understand at least in part what I've got to say

11   about that aspect of it.

12         MR. RANKIN:  I guess the other thing I would say, Your

13   Honor, and again, I'm speculating about the government's

14   motives, but it did seem to me from day one that their focus

15   was on the mayor, not on her.  She was very much beside the

16   point.  And frankly, I was surprised at the complaint and the

17   indictment.  It happens and so they pursued it.

18         But I think, going back to the court's original

19   question of how did we come here and why is this, you know, a

20   reasonable sentence, is that she has pled guilty.  She's

21   acknowledged doing what she was accused of doing.  In the

22   scheme of things, the facts alleged against her pale in

23   comparison to the facts proven against the mayor or proven or

24   acknowledged by the marijuana dealer, marijuana vendors, or the

25   middlemen that entered into cooperation agreements.

1          I mean, with respect to Costa, there's discussion

2     about things that happened in 2016 and 2017 with the water pipe

3     at his building.  She wasn't involved.  She was involved in an

4     exchange of a check for cash in 2017 when she was the mayor's

5     campaign manager, and her involvement consisted of telling the

6     two of them, "Move away from the windows."  That's the Costa

7     count.  The Saliby count --

8          THE COURT:  But there's no question that that was a

9     voluntary plea on her part and no question that there was

10    substantial evidence supporting the finding of proof beyond a

11    reasonable doubt as to that.

12         MR. RANKIN:  I agree with you 100 percent.  You're

13    asking me why is this a reasonable result, and I'm trying to

14    explain that.  Saliby, the gist of that is the statement

15    "You're family now."  She's not there when they negotiate the

16    amount of the bribe, and she is told, as they're leaving the

17    building, "Are you okay?"  Saliby says, "Yes," and so she says,

18    "You're family now."

19         And then the third thing is splitting her salary with

20    the mayor.  So in some ways, it's almost like she was a victim

21    of the mayor's extortion.  I mean, if you look at the letters

22    that were submitted with the sentencing memo, I think you can

23    see that Ms. Andrade is a person who has spent a lot of her

24    life volunteering and trying to help people.

25         And my own analysis is that there was a complicated

1    relationship between Ms. Andrade and the mayor.  I think she

2    felt like he would bring a new breath to the city and she could

3    do a lot of good.  And I think the letters attest to some of

4    the good that she accomplished.

5          But I think he saw her and took advantage of her by

6    requiring her to give half of her salary to him.  And what

7    reason she acquiesced in that or why she acquiesced in that,

8    why the mayor identified her as someone who would succumb to

9    that kind of demand, I don't know.  But to me, it's sad, and

10   it's more of -- to me it's more like she was extorted than she

11   was bribed.  I understand there are two sides of the same coin.

12   She's acknowledged her guilt, but I think in assessing whether

13   this proposed sentence is reasonable, that's a factor that the

14   court can consider, can and should consider.

15          THE COURT:  Okay.  So I raise it again because it uses

16   the same term, "family," Varsity Blues defendants who do things

17   for family, for their children, wanting the very best for their

18   children, but they cross the line.  And in crossing the line,

19   then there is a consequence that runs from it, and it's not

20   enough to say "family" as a way -- or even broadly conceived

21   "family" as a way of dealing with it.

22          That's why this term "family" lends itself to, I agree

23   with you, the overstatement of the government of consiglieri,

24   which when one reads the brief memorandum, belatedly received,

25   is disproportionate to what the recommendation is.

1            But we have this question about what bribery is and

2    what extortion is, and they are flip sides of the same kind of

3    abuse of public trust here.  That's what's involved, abuse of

4    trust or abuse of the bonds that tie society together.

5    Society, not discrete groups that call themselves families or

6    shared political views.  Society.  That's why I'm probing on

7    precisely this issue.

8            MR. RANKIN:  Well -- I didn't want to interrupt you.

9            THE COURT:  No.  Go ahead.

10           MR. RANKIN:  So I guess the other factor that I know

11   was discussed with Mr. Hafer in December, November or December,

12   was brought up by one of the court's questions inviting the

13   parties to submit in-camera filings about the health

14   consequences of any of the participants in trial to be on trial

15   during the COVID era.  And I think that was a factor, our

16   response to that was a factor that I think influenced the

17   government's decision to make this proposal and have it be

18   accepted by the defendant.

19           I mean, you know, just as I was preparing for the

20   hearing over the last few days, reviewing the case, and I

21   talked to Mr. Hafer after the trial and said, "Jeez, you know,

22   with those two -- those three acquittals, I wish I had tried

23   the case."  But it's not a game and it's not something that is

24   for the lawyers' craft or ego.  It's for what's best for the

25   client.

1            And Ms. Andrade doesn't need to go to trial and

2    shouldn't go to trial, and this is a reasonable result.  And in

3    the scheme of things, it's a fair result.  I know it's a big

4    disparity from the guidelines, but I think the guidelines are

5    guidelines, and, you know, they stack up very high just given

6    the way the facts of the case are.  They're very high.  But I

7    don't think that the court should feel like it must reject the

8    plea and set the case for trial because of, I guess general

9    deterrence would be the biggest factor in rejecting it.

10           THE COURT:  Seriousness of the offense would be

11   another.  And, frankly, seriousness of the offense, and

12   frankly, well, you know, Mr. Hafer knows that I'm no fan of the

13   guidelines and particularly in this area, and that the way in

14   which I've dealt with them in the Varsity Blues cases and in

15   other fraud cases is downward departures because I think

16   they're unduly formalistic.  They generate higher figures than

17   they should.  But it's worth emphasizing that there is a

18   structure for dealing with this, and there is an agreement that

19   the guidelines are what the guidelines are.  There isn't a

20   dispute about the guidelines here by the parties on this.

21           And so I will recite them again so we're all clear

22   about it.  It's 70 to 87 months' incarceration, one to three

23   years of supervised release, a fine of $20,000 to $200,000.

24   There is a $600 special assessment necessary under these

25   circumstances.

1          The question of restitution frankly is kind of taken

2    off the table as a result of the agreement, but restitution is

3    something I'd think about here if I were thinking about who

4    should get the money.  Making the money go over to the general

5    treasury in the form of a fine seems to me not the right way to

6    deal with it.  The City of Fall River is out of it, and I would

7    view them and certainly would want to develop the record

8    properly with respect to restitution for the City of Fall River

9    for somebody who paid for violating the public trust.  And

10   that's the seriousness of the offense.

11         Now, is it captured by a sentence of 70 months, 87

12   months?  Of course not.  I never would have thought of it.  And

13   frankly, even knocking it down to what the guidelines were that

14   the parties inaccurately, in their original understanding,

15   thought the guidelines seemed to be too high for this.

16         But I'm not entering into plea negotiations and

17   talking about, you know, what sentence I would impose,

18   wink-wink, nod-nod.  I'm simply dealing with the question of

19   whether this is a reasonable sentence on the premises that have

20   been presented to me.  That's what I'm dealing with here.

21         And so I hear what you have to say, and it is to some

22   degree duplicative -- or parallel I should say of what

23   Mr. Hafer has to say.  We negotiated, and we did our best

24   evaluation of our own special interests.  But your own special

25   interests are not the only interests in this case.  And it's

1    not me.  It is me speaking on behalf of the public who are

2    entitled to have the matter resolved in a fashion that properly

3    calibrates the respective culpability, once established.  And a

4    trial is about establishing culpability by due process, and

5    that's what's problematic to me, I have to say.

6            So I'm trying to be as candid as I can about it.  I

7    will hear from Ms. Andrade.  Under the circumstances in light

8    of things I've said, it may well be that she doesn't want to

9    speak at this point.  You can consult with her.

10           I also note that anomaly of the government taking the

11   position that the defendant lied under immunity, which I assume

12   was the grounds that the government chose not to immunize her

13   for trial, but that seems to me to be deeply inculpatory rather

14   than to say no time.  That is different from the other

15   defendants.

16           Although I will have to assess, and I'm sure the

17   government will address to me whether or not the defendants who

18   actually testified at trial and were people that I will have to

19   sentence testified truthfully.  I'm certainly considering it or

20   will.  I'm reviewing the transcript for precisely that reason.

21   Because frankly, this is to some degree about fidelity to a

22   public trust and also fidelity to the truth.

23           So those factors are ones that play in my mind and

24   give me pause, as I've indicated.  I won't rule until there's

25   been adequate opportunity for everybody to speak who wants to

speak at this point, but I've always taken the position people
should know what I'm thinking about so that they can argue
about it without being surprised by where I end up at the end.

So that's my view of it.  I mean, if there's anything
more you want to say, that's fine.  If you want to consult with
Ms. Andrade about whether or not it makes sense at this point
in this case under these circumstances to offer her views about
why I should accept this plea or not, then of course I'll
consider that as well, and I don't for a moment believe that
it's a matter that should be in any way held against her if she
chooses not to under these circumstances.

MR. RANKIN:  I know she was prepared to allocute, but
I don't think we should do that as things now stand.

THE COURT:  All right.  Well, I think we've discussed
this issue.  I will not accept the plea on the basis of the
information that I've received here or the arguments that I've
received, which seem to me to be principally directed to the
choices that the parties have made about their respective
positions, preserving their respective positions.

As I said, I'm not engaging in a discussion about what
a plea would be that would be one that would cause me to accept
as reasonable a C agreement.  I think that's improper.  It
draws me into plea bargaining, which is something that a court
should not do, but you should know that I view this as a case
that ought to involve some incarceration on the basis of what I

1      now know.

2            This is a circumstance in which the citizens of Fall

3      River were deprived of a faithful employee and payment for a

4      faithful employee.  It's certainly the case that they got lots

5      of good work out of Ms. Andrade, but they're entitled to true

6      faithfulness.  And that, according to what's been presented to

7      me, was not provided.

8            There is that second issue which I raise by asking

9      about the anomaly of someone who lies in her immunized

10     testimony -- not testimony -- proffer I guess -- I guess it was

11     testimony.  It was before the grand jury.

12           MR. HAFER:  It was a proffer, Your Honor.

13           THE COURT:  Proffer.  If that's the government's

14     position, then I'm not sure that it's something that I would be

15     prepared to say is not jail.

16           Truth is too important in all of this for the court to

17     sign off on a sentence like this.  It is not because I don't

18     think that the sentences that can be generated by these

19     guidelines are in the range of reasonableness.  I think they

20     are not.  I made that clear on a variety of occasions and

21     recently in connection with certain cases.

22           I'm not certain that I think that the way in which the

23     police overtime cases have been dealt with are altogether

24     reasonable in light of more information that all of us have,

25     perhaps we should have been more vigilant in trying to obtain.

1    But the obligation of the court to impose a fair and reasonable
2    sentence in the matter before the court at the time and on the
3    basis of what's before me now, I cannot accept this plea, and
4    so I reject it.  And the effect of that is that the parties go
5    back to square one.

6         What does square one mean?  Well, it means the
7    government thinks about whether or not its, what I will call
8    unilateral choices are going to be exercised.  They can make
9    unilateral choices.  They can decide not to prosecute at all.
10   That was a choice that was made with respect to certain of the
11   individuals who were involved in this marijuana scheme, who
12   presented themselves as put-upon.  Well, maybe.  And then maybe
13   they were simply more successful in presenting themselves
14   somehow as victims.  But in any event, there are choices that
15   the government makes all the time about who to prosecute, under
16   what circumstances to prosecute, that is their unilateral
17   responsibility and power.

18        But if they want a signature of a judge on a judgment,
19   then they have to present a reasonable sentence in the range of
20   reasonableness with compelling arguments, and I haven't found
21   that here.

22        That I guess means you think about trial and where the
23   trial is, where it goes from here, when it takes place.  I'm
24   not going to rush it to trial here.  I can't.  We've got a
25   schedule that we all have to work with, and I'm working with it

1    as well.

2           But this plea is not one I will accept or impose the

3    sentence on.  So for those reasons, the plea is not received.

4    And I want to emphasize what I've emphasized before, that the

5    defendant's choice to plead under these circumstances and make

6    certain statements in connection with it are matters that

7    cannot be used against her, except if she contradicts them, and

8    they may be used at that point for purposes of impeachment.

9    But otherwise, the defendant stands not convicted here.

10          There are several people who have been convicted of

11   various things, and I must say to the government what I've said

12   at the outset when I started to talk about this.  There is a

13   very significant question in my mind about how, if at all, I

14   use the acquitted conduct of the defendant Correia.  We all

15   know as a matter of law I can use it right now, and I've done

16   that in the past in cases.  On the other hand, I want to be

17   sure that there is a fairness in assessing conduct,

18   particularly under circumstances in which they now,

19   co-dependent in the crime itself, has not been convicted, does

20   not stand convicted here.

21          What's before me is a defendant who has entered a plea

22   of not guilty, and that's the one that stands at this point

23   because I've rejected the plea of guilty under a C plea.

24          So I will leave it to the parties.  At some point I

25   will obviously try to get some kind of schedule about what you

1   want to do in the case, where it goes from here.  So we will be

2   in recess.

3             (Adjourned, 3:17 p.m.)

4             ---------------------------

5   CERTIFICATE OF OFFICIAL REPORTER

6             I, Kelly Mortellite, Registered Merit Reporter

7   and Certified Realtime Reporter, in and for the United States

8   District Court for the District of Massachusetts, do hereby

9   certify that the foregoing transcript is a true and correct

10  transcript of the stenographically reported proceedings held in

11  the above-entitled matter to the best of my skill and ability.

12             Dated this 24th day of June, 2019.

13

14             /s/ Kelly Mortellite

15             _____

16             Kelly Mortellite, RMR, CRR

17             Official Court Reporter

18

19

20

21

22

23

24

25