UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V. ) | Criminal No. 18-10364-DPW |
| ) | |
| GENOVEVA ANDRADE, ) | |
| ) | |
| Defendant ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The Fall River Mayor's Office was run like a modern day Tammany Hall, with its young Mayor doing his best Boss Tweed. The person that got him elected, the person that stood by his side as the Mayor shook down vendor after vendor, and the person that served as his Chief of Staff, his gatekeeper, and his closest confidant was the defendant, Genoveva Andrade. In the interests of bringing this sordid chapter of Fall River history to a close, and in the interests of justice, the government has entered into a plea agreement with the defendant.

Pursuant to the plea agreement (Dkt. No. 392), the government shall recommend a sentence of time served, 12 months of supervised release, and a $10,000 fine, with Andrade pleading to the single count of False Statements, pertaining to her lie about her salary kickback arrangement with the Mayor.

### The Offense Conduct

The government agrees that the United States Sentencing Guidelines ("USSG") offense level for Andrade is 4, and agrees to recommend the above sentence. The government, however, disagrees with the characterization that the defendant is before this Court for sentencing because she made "a single false statement during a proffer interview and nothing more." Def. Memo at 3 (Dkt. No. 396). If that were the criteria for federal prosecution, court dockets would be inundated

1

with cases. The decision to prosecute is a solemn and weighty one. And it was equally such in Andrade's case.

Andrade was essentially the second most powerful public official in Fall River when she became the Mayor's Chief of Staff. Pursuant to her employment contract and the vestiges of her position, when Andrade spoke, she spoke for the Mayor. And as a public official, when she took an oath to assume her position, she promised the citizens of Fall River that she would serve the citizens of Fall River honorably and faithfully. Andrade did neither.

Instead of standing up for the Fall River businessmen (*e.g.*, MJ Vendors 4 and 5) that were being shaken down in her presence, Andrade stood silent. She didn't protest, she didn't protect them, and she didn't alert any law enforcement authorities to this ugly criminal activity. In other words, she did none of the things that the Fall River citizenry would have hoped for and expected from their public officials.

And in December 2018, when given the chance to come clean with the protection of a judicial immunity order, Andrade came to the U.S. Attorney's Office with her attorney and lied repeatedly to the government about the Mayor's criminal activities for which she had intimate knowledge.[1] Rather than assist federal law enforcement in cleaning up Fall River, she chose to protect the corrupt machine that City Hall had become.

Andrade claims that her belief in the Mayor and "what he could do for the City of Fall River, as well as her personal affection for him, prompted her to give him a substantial portion of her salary in response to his requests for financial help." Def. Memo at 5. But if that were true, Andrade did not need her Fall River salary to "help" out the Mayor. As is evident from the

---

[1] For some reason, counsel points out in their Sentencing Memo: "Prior to the proffer, Ms. Andrade had been granted statutory immunity for her anticipated testimony before a grand jury. She was never called to testify." Def. Memo at 3. Of course she was never called to testify – she lied to law enforcement concerning topics that were to be addressed in the Grand Jury. Including the lie which she is pleading guilty to. Unless Andrade wants credit for the government not suborning her anticipated perjury, it is unclear why the defense mentions this fact.

Probation Office's thorough Presentence Investigation Report ("PSR"), Andrade and her husband have reported considerable financial resources, including joint assets that total over $2 million,[2] and thus Andrade need not have forked over any of Chief of Staff salary to appease the Mayor. PSR ¶ 102.

Andrade gave the Mayor half her salary because that was the deal to become his Chief of Staff, plain and simple. SSI ¶¶ 109-110 (Dkt. No. 69). She could have said no. But like the marijuana vendors who entered into corrupt arrangements with the Mayor, she made her deal too. But why? Was she a "victim of shakedown," as the Court has suggested, according to the defense. Def. Memo at 5. Or was she just being "like a mother" to the Mayor? *Id*. She was neither. Indeed, far from being a victim, the facts uncovered in this investigation demonstrated that this defendant – no stranger to Fall River politics – clearly understood and desired the power and trappings of her new office.

The defense has claimed that unlike most of the cast of characters in this criminal saga, "she did not benefit financially or seek to do so." Def. Memo at 10. Not so. For starters, she got paid (at least half) of her Fall River salary as Chief of Staff. Then, once she accrued the powers of her office, Andrade did not hesitate to use them for her benefit. In June 2018, as MJ Vendor 5 was seeking additional marijuana non-opposition letters from the Mayor's Office, Andrade asked MJ Vendor to hire her relative. MJ Vendor 5 hired Andrade's relative without an interview because he felt it was a request that he could not refuse; moreover, Andrade would occasionally ask MJ Vendor 5 to give the relative time off from work. Andrade never disclosed this arrangement on her State Ethics forms.

In August 2018, Andrade paid a personal visit to MJ Vendor 4's convenience store to request hundreds of dollars of champagne for a personal party that she was hosting. MJ Vendor

---

[2] This figure does not take into account her husband's yearly gross earnings of $835,000. PSR ¶ 104.

4, facing a request that he, too, felt he could not refuse, purchased the champagne and gave it to Andrade. Andrade, who never repaid the debt, also did not disclose this to the State Ethics Office.

Finally, in April 2018, Andrade requested that her relative's boyfriend receive a promotion to a supervisory position in Fall River government. To no one's surprise, the request was granted. Within six months, however, the boyfriend was asked to leave his position because he was grossly unqualified, as reflected by several Fall River citizen complaints and other internal disciplinary issues.

The government agrees that Andrade's Guidelines are 4, but this case is not about a single, isolated, false statement. This case is about Andrade's betrayal of her public office.

**The Probation Office's Guidelines Calculation**

The government agrees that Andrade's USSG Guidelines offense level is 4, in accordance with the terms in the plea agreement (Dkt. No. 392, ¶ 3). The government does not, however, adopt the defendant's February 28, 2022 objections to the PSR ("Def. PSR Objs").

In short, the defendant opposes Probation's application of USSG § 2B1.1(c)(3), which allows Probation to consider more strident Guidelines provisions if the "conduct of conviction establishes an offense specifically covered by another guideline …." The defense has argued its position extensively, but the bottom line is that there does not appear to be any First Circuit precedent that forecloses Probation's position. In fact, additional case law, not cited by the defense, indicates that there is at least disagreement among federal courts as to how to apply this provision.

The government acknowledges that the Second Circuit in *Genao*, 343 F.3d 578 (2d Cir. 2003) and the Eighth Circuit in *Bah*, 439 F.3d 423 (8th Cir. 2006) have narrowly construed §2B1.1(c)(3) to only allow application of a more harsh Guideline provision pertaining to a different criminal offense if the indictment (or charging document) established each element of the different

criminal offense.  *Genao*, 343 F.3d at 585.[3]  But other Circuits have found differently, albeit in unpublished opinions, as well as in published district court opinions.

For example, the D.C. Circuit in *United States v. Nguyen*, 801 Fed. Appx. 788, 789 (D.C.C. 2020) (unpublished) found that the district court properly applied 2B1.1(c)(3) when it considered acquitted conduct in applying the obstruction Guidelines provision at sentencing even though the defendant had only been convicted of False Statements at trial.

In *United States v. Alatrash*, 460 Fed. Appx 487 (6th Cir. 2012) (unpublished), one defendant – charged with only one False Statements count – was sentenced pursuant to the obstruction Guidelines provisions pursuant to 2B1.1(c)(3) because the district court found that her "offense involved obstructing the investigation or prosecution of a criminal offense[.]"  *See id.* 801 Fed. Appx. at 492.

Finally, in *United States v. Carpenter*, 576 Fed. Appx. 610 (7th Cir. 2014), the Seventh Circuit held similarly.  In *Carpenter*, an East St. Louis Police Officer compelled a car-stop arrestee to perform oral sex on him.  Although defendant Carpenter only pleaded guilty to Making a False Statement ("denying to the FBI that he went to Jones Park and received oral sex while on duty on May 8, 2012") and refused to admit that the sexual misconduct was nonconsensual, the district court applied Guidelines provisions for the underlying civil rights violation, pursuant to 2B1.1(c)(3).  *Id*. at 613.  In doing so, the district court considered testimony from the complainant-victim at sentencing.  *See id.*  The Seventh Circuit affirmed the district court's application of 2B1.1(c)(3).  *Id.* at 614.[4]  *See also United States v. Hucks*, 2013WL654397. *2-*3 (E.D.Pa. Feb. 20, 2013) (district court applied 2B1.1(c)(3) to sentence the defendant in accordance with

---

[3] *See also United States v. Garcia*, 590 F.3d 208 (5th Cir. 2009), cited by the defense, which cites to *Genao* and *Bah* approvingly, but does not appear to apply USSG 2B1.1(c)(3) as stringently as those Circuits.
[4] *See also United States v. Ochoa*, 291 Fed. Appx 265 (11th Cir. 2008) (unpublished) (declining to follow *Genao* and *Bah*, and finding that the district court did not plainly err when applying obstruction guidelines pursuant to 2B1.1(c)(3) when defendant was only convicted of making false statements).

counterfeit trafficking Guidelines despite his acquittal of such conduct); *United States v. Hawkins*, 185 F.Supp.3d 114, 119-121 (D.D.C. May 9, 2016) (where defendant pled to Making False Statements in a one-count Information, district court considered offense conduct contained in the Information and in the Statement of Offense Conduct in applying obstruction guidelines, pursuant to 2B1.1.(c)(3)).

What is more, even if this Court were to apply the Second and Eighth Circuit standard, the Probation Office can observe that the charging document (SSI) in this case does, in fact, contain the factual elements of bribery to permit Probation's application of the cross-reference in the Guidelines. Count 26 of the SSI "incorporates by reference paragraphs 83 through 112 of this Second Superseding Indictment." SSI ¶ 131. Thus, the count of conviction in this case includes the allegations contained in ¶¶ 109 and 110, which include Andrade's admission to two separate individuals (MJ Vendor 4 and Middleman 2) that she had agreed to give half of her salary to the Mayor in order to get and keep her job. Indeed, without the incorporation of paragraphs 109 and 110 into the False Statements Count 26, there would be no factual predicate to establish the legal elements of 18 U.S.C. § 1001 as they pertain to Statement 3.

The factual record supporting 2B1.1(c)(3) is not so barren as the defense suggests. As the Probation Office is aware, the defendant in this case gave a full allocution under oath before this Court on December 14, 2020, in which Andrade admitted her complicity in the Mayor salary kickback scheme. After the government outlined the relevant evidence to that charge (AUSA Hafer: "immediately upon her hire as [the Mayor's] chief of staff in November of 2017, she began kicking back approximately half of her salary to [the Mayor]."), the Court inquired of Andrade: "But with respect to things that took place in your presence and the actions that you undertook, is that what happened?" To which the defendant responded: "Yes, sir." (Tr. 12/14/2020 at 30-32).

6

In sum, the government agrees that defendant Andrade's Guidelines offense level is 4, in accordance with the terms of the plea agreement. The government does not adopt the Def. PSR Objs. and takes the position that there is no First Circuit precedent that affirms or precludes Probation's assessment, and that there is at least disagreement as to USSG 2B1.1(c)(3)'s application among federal courts.

**Sentence Recommendation**

Pursuant to the plea agreement (Dkt. No. 392), the government recommends a sentence of time served, 12 months of supervised release, and a $10,000 fine. For the reasons stated in its initial sentencing memo (Dkt. No. 252), the government has arrived at this recommendation after substantial deliberation, extensive negotiation with defense counsel, and consideration of the public interest in obtaining closure of this sad and shameful chapter in Fall River government. The government is also mindful of the tremendous amount of judicial resources that were expended, and were to be expended again, for Andrade's federal trial.[5] (This Court, in particular, had dedicated significant time and resources to the jury selection process to ensure that each juror was impartial and unaffected by the substantial media attention in this case.)

The government is also mindful of the defendant's lack of criminal history, her personal history and characteristics (*e.g.* prior public service and caretaking for her family), her health, and the fact that she was previously immunized by the government.

The government also believes that the sentence, while non-incarceratory, represents significant punishment. Defendant will carry the stigma of a federal felony conviction for the rest

---

[5] The defense has attempted to fault the government for the aborted first trial ("[T]he ordeal of preparing emotionally for trial and then having that trial end abruptly when the government could not proceed was particularly difficult for her to endure.") As counsel well knows, the government proposed proceeding with the December 2021 trial by having the COVID-positive witness testify remotely on Zoom. Defense would not agree to this concession, resulting in the halt in proceedings.

of her life. Her ability to find employment may be hindered and she may face other serious collateral consequences as the result of her felony conviction.

The recommended sentence is sufficient to safeguard the public from further criminal acts of the defendant and sends a strong message to other public officials that lying to law enforcement will result in prosecution, punishment, and other collateral consequences. Accordingly, the government respectfully requests that the Court impose a sentence of time served, 12 months of supervised release, and a fine of $10,000, which the government believes is sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553.

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

By: */s/ Dustin Chao*
DAVID G. TOBIN
DUSTIN CHAO
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Dustin Chao*
DUSTIN CHAO
Assistant United States Attorney